[Civ. No. 43058. Second Dist., Div. Five. Nov. 27, 1974.]

EDWARD W. BUSSE, Plaintiff and Appellant, v.
PACIFIC EMPLOYERS INSURANCE COMPANY,
Defendant and Respondent.

**COUNSEL**

Dudley Gray for Plaintiff and Appellant.

Montgomery, Bottum, Regal & McNally and H. Vincent McNally for Defendant and Respondent.

**OPINION**

**HASTINGS, J.—**

### STATEMENT OF THE CASE

On March 1, 1966, Edward W. Busse (Busse), plaintiff and appellant, loaned A. C. DeForest (DeForest) and John L. Ott (Ott) the sum of $18,800 on a vacant lot on Hawthorne Street (Hawthorne property) in South Pasadena, California, to enable DeForest and Ott to construct a single family residence thereon. Prior to construction, a performance bond was executed guaranteeing construction of the residence. DeForest and Ott were partners and did business under the name of A & J Construction Company, general contractors. The loan of Busse to DeForest and Ott was secured by a deed of trust in the principal amount of $18,800. The construction of the dwelling proceeded according to plan.

On November 29, 1966, an escrow was opened with the Bank of America, Gardena branch, between various parties including Busse, DeForest, and Ott, whereby another dwelling would be built on a vacant lot located on Wren Street (Wren property) in Los Angeles, California. The escrow instructions provided that Busse would reconvey the deed of

trust on the Hawthorne property which secured the note of $18,800 to Ott and DeForest. From the proceeds in escrow Busse would be paid $1,300, and on close of escrow Busse would be issued a new note in the sum of $17,500 secured by a deed of trust on the Wren property to be executed by DeForest and Ott. DeForest and Ott were co-owners of the property. Busse's loan was conditioned on a performance bond[1] (the bond) being posted by Ott and DeForest (similar to the bond in the Hawthorne property transaction) to indemnify Busse in the event the proposed residential building was not completed.

One Benone Terrano, a friend of Busse's, who had been employed at the Bank of America for 17 to 18 years (but which employment he had left), negotiated the Hawthorne and Wren property loans for Busse, who was unskilled in such matters.[2]

On or about February 15, 1967, Ott applied to defendant and respondent Pacific Employers Insurance Company (Pacific Employers) for the bond in the amount of $17,500. The bond application was made on behalf of A & J Construction Company, a partnership, as the contractor, with DeForest and Ott listed as the owners. The application was presented to a Mr. Don A. King (King) of the Merritt-Moseele Insurance Agency. King, as attorney in fact,[3] was an agent for Pacific Employers.[4] Ott knew King "fairly well." King indicated at this time that Pacific Employers would not write a construction bond under a written construction contract in which the owners of the property and the contractor or builder were the same people. King told Ott that the contractor and the owner would have to be a separate person or entity. Ott's testimony on what was said between the two after being notified of this fact is as follows (questions are by Busse's attorney and answers by Ott):

"Q. After he said the application was turned down, what further statements, if any, did he make to you?

---

[1]The escrow instructions designated the bond as a "performance bond." The bond issued was entitled "Contract Bond," a bond common to this type of transaction that names the owner of the property and the mortgagee as the obligees and insures payment to laborers and materialmen who file liens for work or material supplied to the job, and are unpaid.

[2]Busse was a retired employee of the Southern California Water Company and had passed his 75th birthday when this matter went to trial.

[3]Pacific Employers did not dispute this fact.

[4]The record does not disclose if the performance bond issued on the Hawthorne property job was from Pacific Employers. It was, however, issued through the Merritt-Moseele Agency.

"A. That he—that a new application be presented wherein one of us was bonding the other one. In other words, DeForest would be the contractor, and I would be the owner or vice versa.

"Q. Now, in that first conversation, was there anything said that related to the reason that you were asking for the bond?

"A. Yes, there was.

"Q. What was said in that regard?

"A. That the bond had to be furnished as part of an escrow instruction.

"Q. Did you discuss with him the nature of the escrow?

"A. Yes, I did.

"Q. Do you recall now what you told him about the escrow?

"A. Well, I had the escrow instructions with me, and he reviewed it and suggested this method of solution. . . .

"Q. Now, what, if anything, did you do after that first conversation?

"A. I went back to the office and prepared the application the way that he had instructed me to.

"Q. Did you then do something with that application?

"A. Took it back to Mr. King.

"Q. When was that? That is in relation to the first conversation?

"A. It was probably the next day or the following day. It was within a day or two.

"Q. Then did you have a conversation with him when you brought back the revised or the second application?

"A. Yes, I did."

The escrow instructions reviewed by King named Ott and DeForest as joint owners, and provided that they would issue the trust deed note of $17,500 to Busse. It also provided that said parties *"agree to deposit into escrow a performance bond to be handed the lender herein on the within described property."* (Italics added.)

On March 6, 1967, Pacific Employers delivered to King its performance bond in the amount of $17,500, naming Ott as principal (the contractor) and DeForest as owner of the property, and Busse as mortgagee.[5] King gave the original of the bond to Ott who in turn delivered it to the escrow

---

[5]*The premium of $175 was paid to Pacific Employers.*

department of the Bank of America in Gardena at some time prior to July 8, 1967. This bond was then delivered to Busse by the Bank of America at the close of escrow.

The bond recited in part as follows:

"WHEREAS, the Principal [Ott] has entered into a written contract dated February 15, 1967, with the Owner [DeForest] for Construction of dwelling and attached garage [on the Wren property] . . .

"FOURTH: That the right of the Mortgagee hereunder is conditioned upon:

"(a) The payment by or on behalf of the Owner of the payments to which the Contractor is entitled under the *terms of said written contract* with the Owner." (Italics added.)

No written contract was ever executed between Ott and DeForest. De-Forest, as alleged owner of the Wren property, paid no money to Ott under the alleged written contract, and the residence to be built on said property was never commenced. Thereafter, a foreclosure sale was completed on the Wren property and Busse bid the same in for $1,750. There were various costs involved at the sale, and Busse's attorney took a one-third interest in the property as his fee. Ott and DeForest paid Busse only $2,250 on the $17,500 note. It is estimated that the Wren property was worth $5,000 to $6,000. After various credits were applied, Busse's total damages, including interest, amounted to $18,704.

The trial court found in favor of Pacific Employers. Its reasoning can best be described by quoting the record from the reporter's transcript. It said:

"The evidence is uncontradicted that there was no contract between Mr. Ott and Mr. DeForest for the construction of the dwelling on the Wren Drive property. I do not see how there can be any obligation on the part of the surety if there was no prior obligation, and here, I think, the proof must fail on the part of the plaintiff, that there was a primary obligation. But assuming you could get over that on some theory of estoppal [*sic*], that they were, that being the bonding company was estopped from denying their liability by virtue of the fact that they accepted this bond, I still cannot see any way you can overcome the conditional obligations they have in connection with mortgagees, which requires a payment by or on behalf of the owner, the payments to which the contractor is entitled under the terms of said written contract. It's conditional. It spells it out, and there were no payments made here."

Findings consistent with this reasoning were signed. The two key conclusions of law, in substance, were: First, the obligation under the bond does not arise until receipt by the bonding company of a written contract between Ott and DeForest as described in the contract.[6] Second, the contract required payments by the owner (DeForest) to the contractor (Ott). The bond was conditioned on these payments, and when they were not made, Pacific Employers was in fact exonerated.

Other key findings relating to the court's judgment are summarized where appropriate in our opinion.

## Issues

The issue on appeal as urged by Busse is that Pacific Employers is estopped to deny the validity of the bond; therefore, it is responsible to him for the amount of his damages. Pacific Employers, apparently out of an abundance of caution, frames numerous responding arguments on appeal. They add up, however, to the following contentions: (1) Busse cannot prevail because he did not specifically plead estoppel in his complaint; (2) that although the parties to a contract and their successors generally are estopped to deny the truth of recitals contained in the agreement, there is an exception to the rule—applicable here—that it does not apply to the recital of consideration of an agreement; and (3) the doctrine of estoppel cannot be invoked against Pacific Employers because Busse did not prove all the essential elements with the requisite certainty.

## Argument

■ (1) Pacific Employers' first contention is incorrect when applied to the facts of this case. True, it is a general rule that, when estoppel is an element of the defense or plaintiff's cause of action, it must be specially pleaded. (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 944, p. 2524.) However, there is also an exception stated in Witkin, *supra,* pages 2525-2526 as follows: "The requirement of special pleading does not apply where the plaintiff's claim or contention against which the defense of estoppel may be made is not known to the defendant in advance and is not apparent from an examination of the complaint. The defendant does not have to anticipate a possible or even probable claim, but may await the trial and offer his defense without pleading. [Citations.] . . .

---

[6]The first conclusion proceeded to say that the consideration received by Pacific Employers in exchange for its obligation was insufficient since it was never in existence. Pacific Employers places great emphasis on this point and we discuss it *infra.*

"A similar rule applies to the complaint: The plaintiff need not anticipate new matter which may ultimately be stated in the answer, and he can offer evidence of estoppel, without pleading, to meet an affirmative defense. [Citations.]"

Plaintiff's complaint here falls within the exception. The bond appears valid on its face and recites the existence of the contract between Ott and DeForest. Busse sued to enforce it. Pacific Employers then pleaded several affirmative defenses, the principal one being that the written contract between Ott and DeForest, upon which the bond was conditioned, was never executed. This allegation in the answer would be the first time Busse was alerted to this defense. He could therefore raise the issue of estoppel at the trial and was not required to plead it in his complaint.

(2) The issue of estoppel as urged by Busse presents a more formidable problem because the parties have not cited, nor do we find, any California cases directly in point. ■■■ However, we do not hesitate to say at the outset that the facts of this case, as divulged by the record, demand application of the estoppel doctrine to protect the rights of Busse, the only innocent party to the transaction. As a retired Water Company employee, over 70 years of age, he invested in what should have been a relatively safe investment. He placed in escrow the $18,800 trust deed note secured by newly improved property for reconveyance to Ott and DeForest.[7] The reconveyance was conditioned on his receiving cash of $1,300 and a new trust deed note of $17,500 secured by the Wren property upon which a dwelling was to be built. Obviously, the new note would be inadequately secured without the completed improvement on the vacant lot; thus, the escrow instructions required issuance of a performance bond for his protection. The posting of the performance bond was an important, if not the most important, ingredient in the transaction, for without the bond the escrow could not be closed and Busse would retain his valuable $18,800 trust deed note. Busse was in no position to know of the fraud being practiced against him until after the escrow was closed, at which time it was too late to protect himself. A finding of the trial court verifies this fact. It states: "At no time prior to the close of the escrow on July 8th., 1967, did BUSSE have any knowledge that the subject contract bond was applied for or of the execution and delivery of said bond. Further, at no time was BUSSE aware of any written contract entered into between OTT and DE FOREST to construct a dwelling and attached garage on the Wren Street Property

---

[7]Counsel for Busse, in opening argument, stated that after close of escrow and reconveyance of the $18,800 trust deed note, a new note on the property was issued to Ott, who used it to obtain a personal loan to himself of $10,000.

as is recited in the contract bond itself." This finding, as later demonstrated, operates in Busse's favor. The escrow instructions required the subject contract, as did the bond. The fact that Busse did not know of its existence did not militate against his reasonable expectation that such a contract existed before close of escrow. He simply wanted protection as the mortgagee, and there was no reason for him to be aligned with Ott and DeForest in obtaining the bond, and indeed he was not. He relied on the escrow instructions to see that he was furnished a performance bond. He was not required to anticipate fraud by Ott and/or DeForest in obtaining it, or negligence on the part of the bonding company in issuing it. In *Sumitomo Bank of Cal.* v. *Iwasaki,* 70 Cal.2d 81 [73 Cal.Rptr. 564, 447 P.2d 956], the court said at page 88: "Particularly in those cases in which the surety assumes the risk at the debtor's request, rather than the creditor's, the creditor may reasonably assume that the surety will acquire from the debtor himself all information which it reasonably believes to be relevant to the risk." The application of this rule to the case at bench is clear—Ott was the debtor and Busse the creditor.

The law of estoppel apropos to this issue is as follows: It is a general rule that sureties are estopped to deny the facts recited in instruments signed by them, regardless of the truth of the recital. (46 Cal.Jur.2d, Suretyship and Guaranty, § 39, pp. 254-255.) Expansion of this rule is stated in 72 C.J.S., Principal and Surety, § 83, page 565: "In accordance with the rule that a surety is estopped by the material recitals in its bond . . . a surety in a written undertaking may be estopped to assert a defect, [or] irregularity . . . unless such recital was inserted under a mistake of fact [fn. omitted], *particularly where the obligation has been acted on and has accomplished the purpose for which it was given. A surety may be estopped to assert . . . that the bond . . . was given without consideration . . .*" (Italics added.) California also supplies decisional law to guide us. In *Los Angeles S. Co.* v. *National S. Co.,* 178 Cal. 247 [173 P. 79], a completion bond similar to the bond in the present case was issued by the surety, and inured to the benefit of all persons performing labor or furnishing materials on or to the job. The bond recited that the principal had entered into a contract for doing the work. The surety claimed it was exonerated from liability because of a material alteration of the contract to which it did not agree. The court stated at page 250: "The obligation of the surety does· not depend upon the validity of the contract or the faithful performance thereof by the contractor. It exists independently of such facts. . . . 'The surety is charged with notice that he is entering into what is in a very proper sense a public obligation and one that will be relied upon by persons who can in no manner control the conduct of the nominal obligee and with respect to

whom the latter is a mere trustee.' . . . '[I]f the sureties on the bond can defeat the claims of laborers and materialmen because of irregularities in the making of the contract referred to in the bond, it follows that every man who contemplates selling a foot of pipe to a contractor . . . must employ counsel . . . to ascertain whether . . .' . . . the statement of the surety that the contract, *reference to which is made in the bond,* is valid and binding, and see that it is faithfully performed." (Italics added.) The court found this unreasonable. Although Busse was not a laborer or materialman, the bond was issued for his protection. Had labor commenced or material been delivered to the job site, and no payment been made in return, *Los Angeles S. Co.* would prevent Pacific Employers from denying liability on the ground that no contract existed between the owner and the contractor. There is no reason that the same rule should not also favor Busse—like laborers and materialmen, he should not be required to verify the recitals upon which the bond was issued—indeed he could not because he was unaware of the recitals until after he had performed his part of the bargain.

Further, Pacific Employers is not an innocent party. It knew or should have known all of the facts that would have divulged the misrepresentations in the second bond application. King (thus Pacific Employers) knew the true facts about the land ownership and Busse's reason for requiring the bond. One day (or, at the most, two days) later, a new application was in King's hands showing a change of ownership in the property—and a new contractor. These changes are legally possible in such a short time, but it is very unusual. However, before delivering to Ott a bond regular on its face, *with no limitations on its delivery to Busse,* King should have verified the facts set forth in the new application—particularly since he was receiving the information from the principal and not the obligee. (*Sumitomo Bank of Cal.* v. *Iwasaki, supra,* 70 Cal.2d 81.) Indeed King was the only party in a position to do so. King was the instigator of the change. At the very least, he planted the seed of the deceit practiced by DeForest and Ott. To say King did not recognize this deception is to close one's eyes to the obvious. Decisional law is abundant concerning *delivery* of a bond regular on its face, but subject to a condition precedent. ■ Where a surety seeks to avoid liability on the ground that its undertaking was delivered conditionally and the conditions were not performed, the courts ordinarily apply one of two rules, depending on the facts presented: "When the surety's undertaking is complete and regular on its face and the obligee has no notice of conditions imposed by the surety, the surety will be liable; [fn. omitted] on the other hand, when the undertaking is so incomplete on its face as to suggest nonperformance of some condition imposed by a surety,

it carries notice to the obligee and relieves the surety." (74 Am.Jur.2d, Suretyship, § 124, pp. 87-88.) ■ And where a surety signs an obligation regular on its face and turns it over to the principal on the condition others also sign it, the surety is bound if it is delivered by the principal in violation of the condition if accepted by the obligee without notice of the condition. Under this rule the surety is bound on the principle of estoppel for the reason that the creditor is wholly innocent in the transaction. (72 C.J.S., Principal and Surety, § 52, pp. 539-540.) Am.Jur.2d,[8] after stating the same general rule, cites the reason as follows: "Principles of agency and of estoppel are stated to be the legal grounds upon which the decisions are based; that is, a surety having invested his principal with apparent authority to deliver the bond [fn. omitted] is estopped to deny his obligation to the innocent holder, on the principle that where one of two innocent parties must suffer, the loss must fall on the one who put it in the power of a third person to cause the loss [fn. omitted.]" ■ The law as stated is apposite here. Under the reasoning of the trial court, the bond regular on its face was delivered to Ott, the principal, subject to a condition that the contract between Ott and DeForest be delivered to Pacific Employers. Although the bond passed through escrow (without any conditions or instructions on delivery), in effect it was delivered by Ott to Busse who became the innocent creditor, without knowledge of the condition, the moment the escrow was closed and his consideration had been delivered to Ott.[9]

In *Pacific M. & T. Co.* v. *Bonding & Ins. Co.,* 192 Cal. 278 [219 P. 972], the surety on a performance bond refused coverage because the principal had not signed the bond. The surety claimed this was a condition precedent to its liability. The court disagreed, holding the signature of the principal was unnecessary. While the case was resolved on a different point of law than the case at bar, the court recognized certain elements of law that are pertinent here. It said at pages 284, 289, "when the bond was delivered to the obligee without the principal's signature, the obligee did not have constructive notice of any condition attached to its execution by the surety. The natural inference which the obligee would draw under the circumstances would be that the principal's signature was omitted because it was not necessary. . .

"We have related the material facts touching the question of delivery . . . [t]here is nothing upon the face of the bond . . . or in the transaction

---

[8] 74 Am.Jur.2d, Suretyship, section 125, page 89.

[9] The claims manager for Pacific Employers testified it was quite common to issue a bond before the contract was executed, relying on the defense that the bond's effectiveness depended upon the company receiving the contract.

itself which imposed upon the obligee the duty of inquiring of the surety company whether any conditions had been imposed . . . before delivery made."

*Los Angeles S. Co.* and *Pacific M. & T. Co.* satisfy us that California is in accord with the decisional law cited concerning delivery of bonds that are regular on their face. It would be totally unreasonable and unfair to permit Pacific Employers to benefit from nondelivery of the contract to it when such a condition was unknown to Busse as obligee, who has parted with his consideration, particularly when the bond acknowledged the existence of the contract.

We conclude that the trial court erred, and should as a matter of law have ruled Pacific Employers was estopped to deny the existence of the contract as recited in the bond.

■ We do not subscribe to Pacific Employers' argument that section 622 of the Evidence Code[10] is an exception to the rule and prevents the application of the doctrine of estoppel here. The recited consideration applicable to this case is the premium owed for the bond, which was paid. However, we realize part of the trial court's conclusion of law stated that the consideration received by Pacific Employers in exchange for its obligation was insufficient since it (the contract) was never in existence. The law cited, *supra*, plus the rationale of *Los Angeles S. Co.* clearly rebuts any misconception that this was a failure of consideration issue.

■ Pacific Employers' other argument is that the estoppel doctrine can only be applied if the four essentials of the theory as spelled out in *Varela* v. *Wells Fargo Bank*, 15 Cal.App.3d 741, 748 [93 Cal.Rptr. 428], are proved.[11] This argument addresses itself to issues (2) and (3), *supra*. As to issue (2), *Varela* was not considering the estoppel doctrine as applied to surety law. We have delineated the substantive law of estoppel applicable to facts recited in a bond and delivery of the bond subject to a condition

[10]Section 622 of the Evidence Code provides: "The facts recited in a written instrument are conclusively presumed to be true as between the parties thereto, or their successors in interest; but this rule does not apply to the recital of a consideration."

[11]The essentials are: (1) Knowledge of the facts by the party to be estopped; (2) intention that his conduct be acted upon, or he acts so that the party asserting estoppel has a right to believe that the conduct is so intended; (3) the party asserting the estoppel must be ignorant of the true facts; and (4) justifiable reliance on the conduct by the party asserting the estoppel to his injury.

unknown to the obligee. The law cited more than meets the test required to protect the equitable rights of Busse.

On issue (3), contrary to Pacific Employers' contention, estoppel as spelled out in *Varela* decides this issue in favor of Busse. The trial court ruled that the bond contained a specific condition precedent to liability on the part of Pacific Employers (Paragraph Fourth) whereby the owner (DeForest) must make payments to the contractor (Ott) to which the contractor is entitled, and no payments having been made, Busse has no right against Pacific Employers. Normally, nonperformance of this condition would exonerate the surety, but this is not a normal case. For reasons stated earlier, we concluded Pacific Employers was not an innocent party. King, on viewing the first bond application, refused to issue a bond because the owners of the property and the contractor were the same. One, if not the primary, reason behind the refusal was the requirement in Paragraph Fourth that the owner make the contract payments to the contractor. If those persons are the same, the condition is meaningless. Yet, King had the bond issued when he knew or should have known that the owner and the contractor were still the same; accordingly, the reason for not writing the bond remained. This would have prevented the close of escrow and protected Busse.[12] Interestingly, the escrow instructions were not amended to show the alleged changes. King should have verified that amended escrow instructions existed and were approved by Busse. Busse's first knowledge of the aforesaid condition was after delivery of the bond to him. Had he then been able to insure the performance of this condition, Pacific Employers' defense based on nonperformance would be valid. But Busse could not control the payments by Ott to DeForest, and the delivery of his consideration could not be recalled. Under these circumstances the law of estoppel cited in *Varela* estops Pacific Employers from relying on the nonperformance of the condition precedent in Paragraph Fourth. As applied here, the four essentials are clearly met: (1) Pacific Employers had knowledge of the facts. (2) Pacific Employers intended that delivery of the bond to Ott would effectuate the closing of the escrow pursuant to Busse's requirement. (3) Busse was ignorant of the true facts, and (4) Busse justifiably relied on the bond (by reason of his escrow instructions) to his injury.

The trial court, by reason of its ruling, obviously did not consider the question of damages as urged by Busse, and we do not do so here. The

---

[12]Another finding of the trial court is noteworthy here. It is: "DEFOREST did not make any arrangement with OTT of any sort whereby OTT would be or act as the contractor and DEFOREST would be or act as the owner of the Wren Street Property in connection with the construction of a dwelling and attached garage."

record is such that we cannot rule on this issue. We therefore reverse the judgment for the reasons stated and remand to the trial court for further determination of the issue of damages.

Stephens, Acting P. J., and Ashby, J., concurred.

A petition for a rehearing was denied December 13, 1974, and respondent's petition for a hearing by the Supreme Court was denied January 23, 1975.