799 F.2d 1382
 UNITED STATES of America on Behalf and for the Benefit of
ARMY ATHLETIC ASSOCIATION and Naval Academy
Athletic Association, Plaintiff-Appellant,
v.
RELIANCE INSURANCE COMPANY, Defendant-Appellee.
RELIANCE INSURANCE COMPANY, Third-Party-Plaintiff,
v.
ARMY-NAVY '83 FOUNDATION, a California Non-Profit
corporation; Robert H. Finch, an individual; and
Rolfe G. Arnhym, an individual,
Third-Party Defendants.
 No. 85-6290.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 7, 1986.
Decided Sept. 16, 1986.
 
 1
 Stephen D. Petersen, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellant.
 
 
 2
 George C. Mitchel, Booth, Mitchel, Strange & Smith, Los Angeles, Cal., for defendant-appellee.
 
 
 3
 Appeal from the United States District Court for the Central District of California.
 
 
 4
 Before TANG and BRUNETTI, Circuit Judges, and JAMESON,* District Judge.
 
 JAMESON, District Judge:
 
 5
 The United States, plaintiff-appellant, brought this action on behalf of the Army Athletic Association (Army) and the Naval Academy Athletic Association (Navy) (collectively the Academies), to recover on a bond issued by defendant-appellee, Reliance Insurance Company (Reliance), securing moneys to be paid the Academies from the proceeds of the 1983 Army-Navy football game by the Army-Navy '83 Foundation (Foundation). Reliance refused to pay a claim made by the Academies, asserting that the underlying contract between the Academies and Foundation was modified to its prejudice. On cross-motions for summary judgment, the district court granted Reliance's motion, holding that the bond was exonerated by material modifications of the contract, at least one of which was prejudicial to the rights of Reliance as surety.[1] We affirm.
 
 I. Background
 
 6
 On February 18, 1983, the Foundation, a non-profit organization formed to facilitate preparations for the 1983 Army-Navy football game, and the Academies entered into a contract to play the game at the Rose Bowl in Pasadena. Traditionally, the game was played in Philadelphia. The parties drew the contract to ensure that the Academies would receive approximately the same revenue from the 1983 game as they had received from the 1982 game and would not incur additional expenses as a result of the change in location.
 
 
 7
 The contract followed the basic format used in prior years, with some changes. The Foundation was entitled to "revenue generated from ticket sales, and broadcast rights...." (Contract p 2(a)). The Foundation was required to pay each academy $875,000--$550,000 from television revenues and $325,000 from ticket sales and concession proceeds. (Contract p 2(b)). The Foundation agreed to compensate each Academy up to $100,000 for additional costs which were "in excess of those expenses actually incurred by the Army and Navy in conjunction with the 1982 Army-Navy Game." (Contract p 2(c)). Finally, the Foundation agreed to provide funds to transport cadets, midshipmen and support personnel to Pasadena and to provide housing and meals for them while there. (Contract p 2(d)).
 
 
 8
 The contract required the Foundation to obtain two bonds. One bond guaranteed the Foundation's obligation of $650,000 for ticket sales and concession proceeds. (Contract p 2(b)). The Academies released this bond when they collected the money. The second bond, the subject of this lawsuit, guaranteed the Foundation's obligation to pay up to $200,000 to cover additional expenses incurred by the Academies. (Contract p 2(c)). When the Foundation failed to pay for the additional expenses, the Academies filed this action to recover their additional expenses from Reliance.
 
 
 9
 To obtain the bonds, the Foundation had contacted Robert E. Coates, president of the insurance brokerage firm of Ingham, Coates & Payne. Coates, in turn, contacted Dale Dolton of Reliance. Because the Foundation had no assets, Reliance required 100% collateral and indemnification from a financially able person. The Foundation assured Reliance that it was entitled to the television proceeds from the game. In a letter dated February 18, 1983, the Foundation assured Reliance that it would assign the television proceeds to Reliance up to the face amount of the bonds. The television proceeds were initially estimated at $1,100,000. After negotiation with ABC, the television contract amounted to $1,450,000. The Foundation never made the assignment. On their face, the bonds did not mention an assignment of the television proceeds. The bonds contained only two conditions: (1) a force majeure clause; and (2) a six month statute of limitations.
 
 
 10
 Subsequent to the issuance of the bonds, the Academies and the Foundation executed three modifications of the contract.[2] The first modification changed the date of the game from December 3, 1983 to November 25, 1983, a change required by ABC. The second modification, to comply with the National Collegiate Athletic Association (NCAA) master plan, changed the contract to direct payment of the television proceeds to the Army as the host school, rather than to the Foundation. As a result of the second modification the Foundation was entitled to only $350,000 of the television proceeds. The modification, however, relieved the Foundation of its $1,100,000 obligation to the Academies.
 
 
 11
 Finally, less than one week before the game, the Academies and the Foundation executed a third modification of the contract. Unexpectedly, the airlines reserved to transport the cadets, midshipmen and supporting personnel to Pasadena, required payment prior to take off. Paragraph 2(d) of the contract required the Foundation to make such payments, but the Foundation was unable to do so prior to the game and consequent receipt of ticket and television revenues. Pursuant to the third modification, the Academies provided the necessary funds. In return, the Foundation waived its rights to ticket revenue already retained by the Academies, which was payable to the Foundation, and to television revenues in excess of $1,100,000 (i.e. $350,000).
 
 
 12
 Apparently the only persons with knowledge of both the Foundation's assurance that Reliance would receive an assignment of the television proceeds and the three subsequent modifications to the contract were the president and vice-president of the Foundation. Depositions support Reliance's assertion that it knew nothing about the modifications of the contract. The Academies assert they knew nothing about the Foundation's agreement to assign the television proceeds to Reliance.
 
 II. Issues on Appeal
 
 13
 The parties present the following issues on appeal:
 
 
 14
 (1) Whether the modifications materially changed the bonded contract to the prejudice of Reliance;
 
 
 15
 (2) Whether Reliance was estopped to assert further conditions to its liability which are undisclosed on the face of the bond;
 
 
 16
 (3) Whether Reliance ratified or waived any objection to the modifications; and
 
 
 17
 (4) Whether triable issues of fact prevent summary judgment and whether the district court erred in denying the Academies' request for further discovery.III. Applicable Law and Standard of Review
 
 A. Applicable Law
 
 18
 The Academies assert jurisdiction under 28 U.S.C. Sec. 1345. Where the United States asserts Sec. 1345 jurisdiction, this court has held that Erie v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), does not control. United States v. California, 655 F.2d 914, 916-17 (9th Cir.1980). "[A]pplication of state substantive law is not mandated. Where, however, there is 'no clear federal law to apply, federal courts have referred to state law to provide the appropriate rule.' " Id. at 917 (quoting United States v. Nationwide Mutual Ins. Co., 499 F.2d 1355, 1356-57 (9th Cir.1974)). There is no clear body of federal common law with regard to modifications of an underlying bonded contract. Consequently, since there is no "significant conflict" between federal and state law, the court will look to state substantive law for guidance. See United States v. California, 655 F.2d at 917.
 
 B. Standard of Review
 
 19
 This court reviews a grant of summary judgment de novo. Roberts v. Continental Ins. Co., 770 F.2d 853, 855 (9th Cir.1985) (citing Lojek v. Thomas, 716 F.2d 675, 677 (9th Cir.1983)). "Viewing the evidence in the light most favorable to the opposing party, we must determine whether there is any genuine issue of material fact and whether the substantive law was correctly applied." Roberts, 770 F.2d at 855 (citing Fed.R.Civ.P. 56(c); Amaro v. Continental Can Co., 724 F.2d 747, 749 (9th Cir.1984)).
 
 IV. Effect of Modifications of Contract
 
 20
 The primary issue is whether the modifications of the bonded contract exonerate Reliance. As a general rule a surety will be discharged where the bonded contract is materially altered or changed without the surety's knowledge or consent. 72 C.J.S. Principal and Surety Sec. 124 (1951). See also Cal.Civ.Code Sec. 2819 (West 1985); Anstalt v. F.I.A. Ins. Co., 749 F.2d 175 (3d Cir.1984); Argonaut Ins. Co. v. Town of Cloverdale, 699 F.2d 417 (7th Cir.1983); Continental Bank & Trust Co. v. American Bonding Co., 605 F.2d 1049 (8th Cir.1979); Verdugo Highlands, Inc. v. Security Ins. Co., 240 Cal.App.2d 527, 49 Cal.Rptr. 736 (1966). In addition, where, as here, a compensated surety seeks exoneration, it must show that the alteration caused prejudice or damage. 72 C.J.S. Principal and Surety Sec. 124 (1951). See also Ramada Development Co. v. United States Fidelity and Guaranty Co., 626 F.2d 517 (6th Cir.1980) (rule in substantial number of jurisdictions requires surety to show some injury, loss or prejudice). Thus, Reliance must demonstrate that the modifications were material and that some prejudice resulted.
 
 
 21
 The parties dispute the effect of the modifications. The Academies argue that the net effect of the modifications was to benefit the Foundation. Although under the second modification the Foundation lost its right to receive $1,100,000 in television revenue, it was also relieved of its obligation to guarantee that amount in television revenue. The Academies argue that the third modification relieved the Foundation of a $1,267,355.63 payment to the airlines for transporting the cadets, midshipmen and supporting personnel. Yet, in exchange, the Foundation gave up its rights to only $350,000 in excess television revenue. Consequently, the Academies argue, the net effect was a $917,355.63 benefit to the Foundation. Reliance, however, contends that the $1,100,000 lost revenue from the second modification and the $350,000 lost revenue from the third modification coupled with the approximately $1,267,000 decrease in its obligation to the airlines resulted in a net loss of approximately $183,000.
 
 
 22
 Neither party is entirely correct. First, in monetary terms, the second modification has no net effect. The Foundation lost the rights to $1,100,000 in television revenues, but it was also relieved of its obligation to guarantee that amount. Second, the third modification did not relieve the Foundation of its obligation to pay the airlines. The language of the third modification clearly indicates that the Foundation remained liable for the costs of transportation. The third modification merely shifted from the Foundation to the Academies the immediate burden of providing funds for transportation. In exchange, the Foundation relinquished its sole remaining right of any significance under the contract--the right to receive the excess television revenues.
 
 
 23
 The Academies argue that this court should view the modifications of the contract only to the extent they modify the Foundation's obligation which was the subject of the bond in question--the obligation to cover the Academies' additional expenses for the football team. Because the modifications did not affect this obligation, the Academies argue that there was no material alteration of the bonded contract. This view is much too narrow. First, courts construe a bond and its underlying contract together. Pacific Employers Ins. Co. v. City of Berkeley, 158 Cal.App.3d 145, 150, 204 Cal.Rptr. 387, 390 (1984). Second, the bond specifically incorporated the contract. Reliance guaranteed the Foundation's obligation on the basis of the entire contract, not just a single provision. When the bond and its underlying contract are viewed together, it is clear that the modifications were both material and prejudicial.
 
 
 24
 Paragraph 2(a) funded the otherwise assetless Foundation with ticket, concession, and television proceeds. These funds provided the Foundation with a means to satisfy its obligations. As evidenced by the Foundation's February 18 letter promising to assign television proceeds, Reliance relied on the Foundation's funding as provided in the original contract. As the district court concluded, "The impact of the third modification on the Foundation was that it was deprived of the excess television revenues on which it depended to meet its contractual obligations, including those secured by [the bond in question]." Absent the provision that the Foundation would receive the television proceeds, Reliance would likely have determined the risk was too great, and declined to issue the bonds. Had there been no third modification, the Foundation may have had funds available to cover its obligations under paragraph 2(c). The prejudice suffered by Reliance is the increased risk resulting from the modifications. As the Court of Appeals for the District of Columbia has stated:
 
 
 25
 A surety company is not a public utility. It may, for any or no reason, conclude not to furnish its bond with respect to a particular contract. When it has committed itself with respect to one contract, amendments which convert that agreement into a significantly different one should be brought to the attention of the surety so that it may exercise its own business judgment as to whether it wishes to continue its commitment. It is not for the parties to the contract to decide among themselves that their amendments are of no interest to the surety, at least when, as here, those amendments go beyond mere matters of form.
 
 
 26
 Reliance Ins. Co. v. Colbert, 365 F.2d 530, 534 (D.C.Cir.1966). We conclude that the district court correctly held that the modifications were material, "at least one of which, the third, was prejudicial to its rights as surety."
 
 V. Estoppel
 
 27
 The Academies assert that "Reliance is estopped to raise the modification defense based on its claim of right to the television revenue." The Academies mischaracterize Reliance's defense. Reliance's defense is that the modifications materially altered the underlying contract which the bond specifically incorporated, and it is accordingly exonerated from liability. Reliance's defense is not that the promised assignment is a condition of its liability. Rather, the promised assignment is proof of its reliance on the terms of the underlying contract, specifically the allocation of television revenues. We recognize that had Reliance based its defense on the promised assignment of television proceeds, it would be estopped to assert a defense based on a "secret" agreement. See Busse v. Pacific Employers Insurance Co., 43 Cal.App.3d 558, 117 Cal.Rptr. 718 (1974).VI. Waiver/Ratification
 
 
 28
 The Academies also claim that Reliance has waived or ratified the modifications of the bonded contract. "Waiver occurs when there is 'an existing right, a knowledge of its existence, and an actual intention to relinquish it, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished.' " Mardirosian v. Lincoln National Life Ins. Co., 739 F.2d 474, 477 (9th Cir.1984) (quoting Silva v. National American Life Ins. Co., 58 Cal.App.3d 609, 615, 130 Cal.Rptr. 211, 214 (1976). A finding of waiver or ratification, thus, requires a known right and express or implied intent to relinquish that right. The Academies' waiver or ratification argument fails for two reasons. First, from our review of the record we find nothing to support the Academies' claim that Reliance had actual knowledge of the modifications.[3] Second, even if Reliance had knowledge of the modifications, the Academies have not pointed to facts sufficient to establish Reliance's consent. The Academies argue that Reliance's consent may be inferred by its silence. The cases they rely on, however, involved express waivers. See American Security Bank v. Clarno, 151 Cal.App.3d 874, 199 Cal.Rptr. 127 (1984); Union Bank v. Ross, 54 Cal.App.3d 290, 126 Cal.Rptr. 646 (1976). Absent a showing of Reliance's knowledge of and consent to the modifications, we hold that Reliance neither waived nor ratified the modifications.
 
 
 29
 VII. Triable Issues of Fact and Lack of Adequate Discovery
 
 
 30
 A. Were there Genuine Issues of Material Facts?
 
 
 31
 Summary judgment is proper "if the moving party has demonstrated the absence of any issue of material fact and the right to judgment as a matter of law." Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir.1980) (citing Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Mutual Fund Investors, Inc. v. Putnam Management Co., 553 F.2d 620 (9th Cir.1977)). The Academies argue that triable issues of fact preclude summary judgment. The record, however, contains undisputed facts which establish that the modifications were material and prejudicial. In addition, as noted supra, the record establishes that the modifications were made without Reliance's knowledge or consent. These undisputed facts support the conclusion that the contract modifications exonerated Reliance, that no triable issue remained, and that the district court properly granted summary judgment.
 
 B. Refusal to Reopen Discovery
 
 32
 The Academies' final argument is that the district court deprived them of sufficient opportunity for discovery. "[A] district [court] has wide latitude in controlling discovery, and its ruling will not be overturned in the absence of a clear abuse of discretion." Foster v. Arcata Associates, 772 F.2d 1453, 1467 (9th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1267, 92 L.Ed.2d ---- (1986). When the party has not had a prior opportunity for discovery, after moving for discovery under Fed.R.Civ.P. 56(f), the court should allow the party time for discovery. Program Engineering, Inc. v. Triangle Publications, 634 F.2d 1188, 1193 (9th Cir.1980). The Academies, however, could have pursued discovery during the six months from the filing of Reliance's answer and four months from the court's order providing for discovery.[4] They chose not to do so. From the time Reliance filed its initial answer, the Academies knew that Reliance would need to prove the modifications were made without its consent. They had ample opportunity for discovery. Moreover, it is unlikely that any evidence would be developed from the depositions of Coates or Dolton which would tend to prove that Reliance had knowledge of or consented to any of the modifications of the contract.[5] Under the circumstances, the district court did not abuse its discretion in refusing to reopen discovery.
 
 VIII. Conclusion
 
 33
 The modifications of the contract between the Academies and the Foundation were material, at least one of which, the third, was prejudicial to the rights of Reliance as surety. Reliance had no knowledge of the modifications and did not consent thereto. Under the circumstances, the bond was exonerated. Reliance was not estopped to raise the defense of material alterations and did not waive its defense or ratify the modifications. The district court did not abuse its discretion in denying further discovery.
 
 
 34
 AFFIRMED.
 
 
 
 *
 The Honorable William J. Jameson, United States District Judge, for the District of Montana, sitting by designation
 
 
 [1]
 The United States filed the complaint on June 1, 1984. Reliance filed its answer and a third party complaint against the Foundation and its two officers, Robert H. Finch and Rolfe G. Arnhym, on August 2, 1984. The United States filed a motion for summary judgment, and Reliance a cross-motion. The district court entered its summary judgment for Reliance on June 6, 1985. To obtain a final appealable order, the parties stipulated that Reliance's counterclaim be dismissed, without prejudice, provided the summary judgment order was affirmed by this court
 
 
 [2]
 The Academies and the Foundation also entered into an Addendum to the contract, executed March 9, 1983
 
 
 [3]
 The Academies argue that Reliance's knowledge is established in the record by the following portion of the deposition of Robert H. Finch, the president of the Foundation:
 Q. So it's your best belief at this time, that Mr. Coates was made aware of the problem with the television contract proceeds sometime prior to the execution of the modification?
 A. I would think so, but I can't give you a specific, independent recollection.
 Q. You didn't do that yourself?
 A. Well, I would see him in the hall, going up in the elevator, I'd say, "Here is where we are, this has happened, that's happened." What I should have done is put it in writing and sent it to him, but I didn't.
 Q. Did Reliance, to the best of your knowledge, ever give its consent to that modification?
 A. No.
 This is the only portion of the record which even suggests that Reliance might have had knowledge of the modifications. Other portions, and particularly several depositions including that of Rolfe G. Arnhym, one of the officers of the Foundation, clearly indicate that Reliance did not have knowledge of the modifications. The record as a whole supports the conclusion of the district court that Reliance "received no notice of the modifications" and that "Reliance was never asked to consent to any of the modifications, nor did it give its consent to any of them."
 
 
 [4]
 Plaintiff's complaint was filed on June 1, 1984 and defendant's answer and third-party complaint on August 2, 1984. Plaintiff's motion for summary judgment was filed on October 29, 1984, and noticed for hearing on November 19, 1984. Defendant's opposition to plaintiff's motion and its own motion for summary judgment was filed on March 12, 1985, following discovery. Plaintiff filed its opposition to defendant's motion on March 20, 1985. Hearing on both motions was held on April 8, 1985, and defendant's motion was granted in the order entered June 6, 1985
 
 
 [5]
 A declaration of Dale Dolton, filed March 13, 1985, states: "Reliance was never informed by anyone that any modifications of the original February 18, 1983 contract were contemplated or executed, nor did Reliance ever consent to any such modification."