**NATIONAL UNION INDEMNITY COM-
PANY, Appellant,**

v.

**G. E. BASS AND COMPANY, Inc., et al.,
Appellees.**

**No. 21761.**

United States Court of Appeals
Fifth Circuit.

Nov. 25, 1966.

Roger C. Landrum, Jackson, Miss., A. Morgan Brian, Jr., New Orleans, La., George H. Butler, Jackson, Miss., R. Emmett Kerrigan, New Orleans, La., for appellant. Deutsch, Kerrigan & Stiles, New Orleans, La., Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., of counsel.

J. A. Covington, Meridian, Miss., for appellees.

Before BROWN, BURGER,* and WISDOM, Circuit Judges.

BURGER, Circuit Judge:

This appeal is from judgments entered by the United States District Court for the Southern District of Mississippi in four consolidated cases. All four of the cases involved claims by the federal government's prime contractor, G. E. Bass and Co., Inc., and its Miller Act surety, United States Fidelity and Guaranty Co., against National Union Indemnity Co., surety for the subcontractor, Mojave Electric Company.[1] Mojave defaulted on its subcontract prior to completion leaving sums owed to various materialmen.

The essential facts are not in dispute. During the progress of the work the prime contractor, Bass, made periodic payments to the subcontractor, Mojave. Article 2 of the subcontract allowed progress payments to be made by Bass to Mojave for labor and materials *actually installed* in the project. Article 2 also authorized payments for uninstalled materials delivered and stored at the project site if Mojave furnished Bass with proof of payment for them.[2] At the time each progress payment was made Bass did not require, nor did Mojave submit, any proof of payment to suppliers for the uninstalled materials.

Mojave's subcontracting work prior to default spanned eleven payment periods. In five of these periods, Bass paid Mojave *less* than the amount earned by Mojave during those periods for labor and materials actually installed. Consequently, no part of those payments could have been for uninstalled materials. In five other periods Bass paid Mojave *more* than the amount earned by Mojave for labor and materials actually installed during those periods. In each of these latter periods the excess above the amount actually earned was payment for uninstalled materials. Under the terms of Article 2 of the subcontract Bass had a contractual duty to require proof of payment by Mojave for the uninstalled materials before advancing payments for them. All of the uninstalled materials delivered to the project site at the time of default were subsequently incorporated into the project by other subcontractors and credit was given for them.

---

1. Three of the suits were to recover amounts paid by Bass and its surety, United States Fidelity & Guaranty Company, in satisfaction of judgments for the unpaid bills of materialmen. The fourth suit was to recover the amount of alleged losses sustained by Bass as a result of having to relet Mojave's defaulted subcontract. The latter suit is not in issue in this appeal, National having conceded that the judgment entered therein is correct.

2. Apparently the purpose of this provision is based on the theory that materials delivered and stored but for which payment has not been made are not part of the realty and the supplier can reclaim his material if it remains unpaid. Consequently, the supplier does not need the security of the Miller Act Bond. Once the material is incorporated into a public works project, however, the subcontractor is entitled to payment whether or not he has paid his suppliers, and the suppliers have no lien on materials incorporated into public projects. In this case one of the purposes of the Miller Act is for the benefit of unpaid suppliers.

The total amount of overpayments for uninstalled materials in the five overpayment periods was $25,182.02. The net overpayment at the end of the last payment period was $2,539.29, derived from using a running account and combining the overpayments and underpayments as they occurred chronologically throughout the eleven payment periods. The high point of overpayment—the point at which the *net* overpayments reached their highest peak—was $17,224.54, occurring in the fourth payment period.

The District Court held that the overpayments for uninstalled materials made by Bass without proof of payment by Mojave, in violation of the provisions of the subcontract, were not such a material departure from the terms of the subcontract as to constitute prejudice which released National *in toto* as surety on the subcontractor's performance bond.[3] National claims that it should be released *in toto* by reason of the contractual breach by Bass or, in the alternative, that judgments entered against it in the District Court should be reduced by $25,182.02, the total amount of overpayments alone, or $17,224.54, the high point of overpayments in the net running account.

 The rule in Mississippi and elsewhere—sometimes called the modern rule—is well-settled as regards premature or unauthorized payments under contractor's bonds. Where there has been a material departure from contractual provisions relating to payments and the security of retained funds, a compensated surety is discharged from its obligations on the performance bond to the extent that such unauthorized payments result in prejudice or injury, e. g., *Metropolitan Cas. Ins. Co. of New York v. Koelling*, Miss., 57 So.2d 562 (1952); *Picard v. Shantz*, 70 Miss. 381, 12 So. 544 (1892); see generally 17 Am.Jur.2d Contractor's Bonds § 32 (1964) and cases cited therein. With the development of compensated sureties this court long ago rejected the old rule of total discharge

in favor of the more modern *pro tanto* rule, see *Forth Worth Independent School Dist. v. Aetna Cas. & Surety Co.*, 48 F.2d 1, 77 A.L.R. 222 (5 Cir.), cert. denied, 284 U.S. 645, 52 S.Ct. 24, 76 L.Ed. 548 (1931). Both National and Bass concede the validity of this rule. The purpose of the *pro tanto* release rule is that the material departure from the terms of the contract deprives the surety of the inducement to perform which the contractor would otherwise have, and destroys, diminishes, or impairs the value of the securities taken. See Arant, Rationale of the Rule That An Obligee's Premature Payment Discharges His Surety, 80 U. Pa.L.Rev. 842 (1932).

 National, however, argues that the *pro tanto* release rule and the cases supporting it apply only to instances of isolated and inconsequential contractual breaches where prejudice is easily measured. It urges us to adopt a rule whereby a compensated surety is discharged *in toto* from its obligations where the contractual breach is substantial, material, continuous, and willful, or when the amount of prejudice suffered is incapable of precise measurement. It claims that the facts in the instant cases compel the application of such a rule. We have examined the cases cited to us by National and Bass and, while many of them do involve singular or isolated breaches, it is clear that the *pro tanto* release rule is not dependent on a multiplicity of breaches. Moreover, upon examination of the record before us we do not find that the breach was so complete as to obliterate the contract. Nor do we believe the prejudice suffered by National is incapable of precise measurement. For these reasons we reject National's argument that it should be totally discharged.

 Bass on the other hand relies upon a mitigation theory. First, it argues that since all of the materials left on the project site were subsequently incorporated into the project with National re-

---

3. The District Court did allow one of the judgments to be reduced by $2,539.29, the amount of the net overpayment existing at the time of the last payment period.

ceiving credit for them, National is fully liable just as if the defaulting subcontractor had incorporated all of the materials into the project during each payment period leaving no materials stored on the site. Second, Bass claims that any prejudice suffered by National during each overpayment period was mitigated by subsequent underpayments such that the net amount of the overpayment is the only measurable prejudice suffered. To carry the former argument to its logical conclusion would make the contractual provision meaningless. Under that view Bass could have paid the entire contract price at the outset and relied upon the bond for payment to materialmen. But this is not the obligation National assumed when it entered the contract. It would be tantamount to guaranteeing the performance of a contract without safeguards. Here National assumed the less hazardous risk of guaranteeing the contractual performance where progress payments were safeguarded. See Hall v. Union Indemnity Co., 61 F.2d 85 (8 Cir.), cert. denied, 287 U.S. 663, 53 S.Ct. 222, 77 L.Ed. 572 (1932). With respect to the second point, the record does not show whether the materials for which premature payments were made in a given pay period were the same materials left unpaid for when the subcontractor defaulted. Moreover, it is not reasonable to assume that the subcontractor paid for all of the materials for which overpayments were made and left unpaid only those materials for which no advances were made. Thus we are unable to agree with Bass' mitigation theory and with the District Court finding that the only measure of prejudice was the net overpayment existing at the time of the subcontractor's default.

It is clear that the continuous premature payments altered the contract to such an extent that it was substantially and materially different from that which National had bonded. If receipted invoices had been properly presented as required under the terms of the contract it is reasonable to assume that the de-

fault by the subcontratcor would have occurred sooner, the unpaid material bills would have been smaller, and National could have stepped in to lessen its losses.

Applying our view of the law to these facts we conclude that the amount of prejudice suffered by National can be fixed at $17,224.54, the high point of the overpayments during the course of the payment periods prior to default. National is entitled to be released to that extent on its performance bond. We reject National's claim that it should be released to the extent of the total amount of overpayments alone since a reasonable assumption on this record is that some of the overpayments subsequently were used to discharge unpaid obligations. The judgments of the District Court are

Reversed and remanded for further proceedings not inconsistent with this opinion.