**FIREMAN'S FUND INSURANCE COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 561–86C.**

United States Claims Court.

Aug. 9, 1988.

Charles D. Ablard, Washington, D.C., for plaintiff. Paul Scott Kelly, Jr. and Stephen B. Sutton, of counsel.

Helene M. Goldberg, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on plaintiff's motion for partial summary judgment. Defendant opposed. Plaintiff's complaint challenged the contracting officer's final decision which assessed reprocurement costs incurred as a result of the general contractor's default. Plaintiff's motion alleged that defendant prematurely released all retainages under the contract totalling $563,822 to plaintiff's detriment and in breach of the terms of the contract. By its motion for partial summary judgment, plaintiff requested this court that it be discharged *pro tanto* from liability on its performance bond.

## FACTS

In March 1982, the Department of the Army awarded Westech Corporation (Westech) a contract for $5,892,000 to build a pressure recovery system for the high energy laser system test facility at White Sands Missile Range, New Mexico. The pressure recovery system, a vital part of defendant's test facility, was needed so that research projects at the facility could proceed. The original completion date of the contract was August 22, 1983 but, due to an eight month delay in the process of making and approving .drawings and acceptable specifications for the project, defendant extended the completion date to September 30th, 1983. Plaintiff, Fireman's Fund Insurance Co., became the contract's surety pursuant to the Miller Act, 40 U.S.C. §§ 270a–270d (1976), by its issuance of a performance bond in the amount of $5,892,-000, naming Westech as principal and the United States as obligee.[1]

Subpart (c) of Paragraph 7 of the Superseding General Provision to the standard construction contract governed defendant's manner of payment to Westech:

> In making ... progress payments, there shall be retained 10 percent (10%) of the estimated amount until final completion and acceptance of the contract work. However, if the Contracting Officer finds that satisfactory progress was achieved during any period for which a progress payment is to be made, he may authorize such payment to be made in full without retention of a percentage. Also, whenever the work is substantially complete, the Contracting Officer shall retain an amount he considers adequate for the protection of the Government and, at his discretion, may release to the Contractor all or a portion of any excess amount.

During the course of contract performance, Westech submitted monthly pay estimates based upon the percentage of project completion. On pay estimates one through fourteen, defendant elected to retained ten percent of the monthly costs billed by Westech. After pay estimate fourteen, at the

1. Plaintiff also provided the required payment bond under this contract.

end of May 1983, Westech asked for semi-monthly rather than monthly payments, as well as release of the previously retained funds because it was experiencing cash flow problems from overtime expenditures incurred in an effort to comply with the September 30, 1983 completion date. At the time of Westech's request the project was about eighty-five percent complete. There was no indication that Westech would be unable to complete the contract, and defendant was satisfied with Westech's progress. Defendant, however, had received several complaints from subcontractors about nonpayment or late payment from Westech. To alleviate Westech's cash flow problems and assist in its payment responsibilities, defendant released the full previously retained amount in several increments during June and July, 1983. Defendant believed that releasing the retained funds would help assure project completion and thus benefit the government, Westech, subcontractors, suppliers, materialmen. With hindsight, defendant would add plaintiff to the list of beneficiaries.

Defendant's records suggest that part of the retainage may have been released to allow Westech to pay for additional costs and overtime expenses caused, in part, by defendant. In an intra-office memorandum defendant admitted that at least part of Westech's labor and material costs were caused by defendant's delay in resolving discrepancies between the contract drawings and performance specifications but that Westech had to bear part of the blame by failing to make timely submittal of acceptable drawings. The delay forced Westech to work its employees overtime, at pay premium rates, in an effort to complete the work on time. Other records of defendant suggested that part of the retainage may have been released to finance progress payments while more funds were in the process of being approved and reprogrammed by defendant for changes in specifications. The court is not aware of how Westech actually used the retained funds.

In September, 1983 defendant again made several changes to the contract and extended the completion date to December 31, 1983. In response to two claims submitted by Westech additional funds were set aside in September and November of 1983 for the cost of the extension, including overtime expenses Westech had incurred to date.

After July, 1983 all retained funds had been released but defendant continued to receive complaints from subcontractors and materialmen of nonpayment by Westech. Nevertheless defendant continued to pay Westech's progress payments in full. In December 1983, plaintiff notified defendant of Westech's unpaid debts and requested that defendant make no further payments to Westech without its consent. Defendant honored plaintiff's request and withheld Westech's progress payment for December. Plaintiff did not question defendant at that time about the previous release of retained funds to Westech.

On December 16, 1983, two weeks before the completion date, Westech abandoned the project. On December 29, 1983, after giving Westech and plaintiff notice, defendant terminated the contract for default and due to the urgent need to complete the project requested plaintiff to resume work no later than January 10, 1984 if it desired to finish the project. Plaintiff decided it could not submit a proposal on such short notice. Accordingly, defendant informed plaintiff it would complete the contract and charge Westech and/or plaintiff for any excess reprocurement costs.[2] The reprocurement contractor substantially completed the contract work in April, 1984. In September, 1985 the contracting officer issued a final decision assessing excess reprocurement costs against plaintiff in the amount of $583,903.

## DISCUSSION

Summary judgment is appropriate where it appears from the pleadings that there is

---

**2.** Defendant also evinced its intent to charge Westech and/or plaintiff liquidated damages, if provided in the contract, but nothing more was said about the matter and the court has not included it in its adjudication.

no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Cooper v. Ford Motor Co.,* 748 F.2d 677, 679 (Fed.Cir. 1984); RUSCC 56(c). In a motion for summary judgment, all inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Housing Corp. v. United States,* 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972). The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact. *Id.* The court finds the operative facts delineated above to be undisputed by the parties.

In this case, the court must resolve two issues in order to rule on plaintiff's motion for partial summary judgment. First, the court must determine when the project was substantially complete in order to decide whether defendant departed from the terms of the contract in releasing the retainage in June and July of 1983. If that threshold issue is resolved in plaintiff's favor, the court must then determine to what extent defendant's premature release of the retainage was material and prejudicial to plaintiff.

A suretyship consists of a three party agreement. The surety becomes liable for the principal's, or obligor's, debt to the third party obligee; but the surety also has equitable rights of subrogation against the obligee, *i.e.* defendant. *Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1160 (Fed. Cir.1985). Here, plaintiff was the surety, defendant was the third party obligee, and Westech was the principal or obligor.

■ Normally, the government has a strong interest in a project's timely and efficient completion by its contractor. In furtherance of its interest the government contracts for a broad range of rights designed to promote continuation of the contract work. Public policy allows the government flexibility in administering its contracts because of so many unforeseen events which may hinder performance. *Argonaut Ins. Co. v. United States,* 193 Ct.Cl. 483, 493–94, 434 F.2d 1362, 1367–68 (1970); *see United States Fidelity & Guar. Co. v. United States,* 230 Ct.Cl. 355, 364, 676 F.2d 622, 628 (1982).

Notwithstanding its own interests, a stipulation in a construction contract for the retention of a portion of the consideration until the work is completed is as much for the protection of the surety as for defendant. *Home Indem. Co. v. United States,* 180 Ct.Cl. 173, 177, 376 F.2d 890, 893 (1967) (quoting *Prairie State Bank v. United States,* 164 U.S. 227, 239, 17 S.Ct. 142, 147, 41 L.Ed. 412 (1896)). Generally, a disregard of such stipulation by the voluntary act of the obligee operates to release the surety. *Prairie State,* 164 U.S. at 233, 17 S.Ct. at 145; *Fort Worth Indep. School Dist. v. Aetna Casualty & Sur. Co.,* 48 F.2d 1, 4 (5th Cir.1931). If the government retains money as security and if the surety incurs obligations under the contract, the money is available to the surety for reimbursement. *Balboa,* 775 F.2d at 1163. Thus, the government has a duty to balance its own interests against the possible harm to the surety in the administration of the contract. *Royal Indem. Co. v. United States,* 208 Ct.Cl. 809, 823, 529 F.2d 1312, 1320 (1976); *United States Fidelity & Guar. Co. v. United States,* 201 Ct.Cl. 1, 14, 475 F.2d 1377, 1384 (1973). It is more difficult, however, to apply these broad maxims of suretyship law to the facts of a particular case than it is to state them in the abstract. *United States v. Continental Casualty Co.,* 512 F.2d 475, 478 (5th Cir.1975).

■ In the case at bar, the parties disputed whether defendant correctly balanced its interests against those of plaintiff. Plaintiff alleged that the contract permitted defendant to release the retainage at its discretion only after substantial completion of the contract work which, by agreement of the parties, did not take place until nine months after defendant released all retainages to Westech. Defendant contended that because it found the contract work was progressing satisfactorily, the contract granted it discretion to retain or release retained funds. Defendant further

argued that because it had discretion to retain the funds, by implication it also had the same discretion to release all retainages. In other words, as long as there was satisfactory progress, defendant contended it had discretion to release all retainages.

The language of the contract more readily supports plaintiff's interpretation of the "Payments to Contractor" clause in the contract. If work progressed satisfactorily during any contract period for which a progress payment was made, clause 7(c) granted the contracting officer discretion whether or not to retain ten percent of that progress payment. Conversely, clause 7(c) also limited the contracting officer from releasing the retainage, in whole or in part, unless "the work is substantially complete." 32 C.F.R. § 7–602.7(c) (1979). Thus, although defendant determined to pay Westech progress payments for each payment period in full after the fourteenth payment because work had progressed satisfactorily, the contract expressly stated that defendant had no discretion to release the retainage accumulated during the first fourteen payments until the contract work was substantially complete.

Defendant vigorously argued that satisfactory progress, and not substantial completion, is the threshold for the right to release the entire retainage. The court is not able to read defendant's interpretation into the contract. Defendant may have confused the contractual language in clause seven, as amended in 1979, with an earlier and less restrictive version. From 1964 until the late nineteen seventies, government construction contracts contained an additional provision in the "Payments to Contractor" clause. The clause, as amended in 1964, stated in part:

> Where the time originally specified for completion of this contract exceeds one year, the Contracting Officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may reduce the total amount retained from progress payments to an amount not less than 10 percent of the estimated value of the work remaining to be done under the

contract or 1½ percent of the total contract amount, whichever is the higher. 32 C.F.R. § 7.602–7 (1966). Thus, the contracting officer had discretion, after fifty percent of the work was done and as long as the contractor was making satisfactory progress, to reduce the retainage to five percent or less of the estimated total value of the work depending on how much work remained to be completed, but always to retain at least 1½ percent of the total value of the work. *United States v. Continental Casualty Co.*, 346 F.Supp. 1239, 1246 (N.D.Ill.1972). Even this older provision did not grant defendant discretion to release all retainages. This argument, however, would be irrelevant because the 1964 provision has been removed from the controlling "Payments to Contractor" clause in this case. The current and only provision in the contract that addresses the issue of the release of previously withheld retained funds, states in its entirety: "Also, whenever the work is substantially complete, the Contracting Officer shall retain an amount he considers adequate for the protection of the Government and, at his discretion, may release to the Contractor all or a portion of any excess amount." 32 C.F.R. § 7–602.7(c) (1979) (compare with 32 C.F.R. § 7.602–7 (1974)). Defendant would have the court ignore express contractual language drafted for defendant's own protection and imply a construction even more favorable to defendant in this particular instance. The court cannot do so.

■ Alternatively, defendant argued rhetorically that it could have chosen not to retain any funds if Westech's work had been to its satisfaction from the beginning and throughout its entirety, thus offering no security to plaintiff for reimbursement purposes, *i.e.*, not generating any retainage. As a consequence, defendant argued, it made no sense to hold defendant to a higher standard if it chose to later release the retainage. In evaluating the provision dealing with the retention of funds in conjunction with the provision addressing the release of retainage, the court disagrees with defendant's hypothetical argument. It is well-settled that an interpretation which gives a reasonable and effective

meaning to all the terms is preferred to an interpretation which leaves a part unreasonable or of no effect. *E.g., Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965); Restatement (Second) of Contracts § 236(a) (1932). The language of a government contract should be given the meaning that would be understood by reasonably intelligent persons. *American Elec. Contracting Corp. v. United States,* 217 Ct.Cl. 338, 348, 579 F.2d 602, 607 (1978). Because retainage constitutes an incentive to complete the contract work, it is more reasonable that it be kept until substantial completion of the work, rather than until perhaps fleeting, temporary satisfactory progress during one or a few pay periods is achieved. In contrast, as long as there is satisfactory progress for any particular period of contract work, it is perfectly reasonable not to require defendant to retain ten percent of the progress payment for that particular pay period. In summary, in light of the plain contractual language and a reasonable interpretation thereof, the court concludes that defendant had no discretion to release the entire retainage unless and until the contract work was substantially complete.

■ Substantial completion generally occurs when the building under construction can be occupied, even though some minor items still need correction or completion. *See J.D. Hedin Constr. Co. v. United States,* 197 Ct.Cl. 782, 794, 456 F.2d 1315, 1326 (1972). Such an issue is factual in nature and normally defendant is entitled to some latitude in declaring when it occurred. *See Wertheimer Constr. Corp. v. United States,* 186 Ct.Cl. 836, 847, 406 F.2d 1071, 1077–78 (1969); *see also Hedin Constr. Co.,* 197 Ct.Cl. at 794, 456 F.2d at 1326. The determination of when substantial completion occurs normally precludes summary judgment if it turns on disputed and material facts. RUSCC 56(c). Here, however, substantial completion is undisputed. Defendant admitted in its statement of genuine issues that the contract work was substantially complete in April,

1984, nine months after the retainage was released. Defendant further stipulated in oral argument that substantial completion, as defined in the context of contract law, did not occur until April, 1984. Consequently, the court concludes that defendant failed to abide by the terms of the contract when it released all retainages in June and July of 1983, nine months prior to the work being substantially complete.

■ Defendant's departure from the contract terms, however, does not necessarily render it liable to the surety. It is well-settled in many jurisdictions that if the obligee departed from or altered the contractual provisions relating to payments and/or the security of retained funds, a surety is discharged from its obligations only to the extent it can show injury, loss, or prejudice. *Chapman v. Hoage,* 296 U.S. 526, 530–31, 56 S.Ct. 333, 335, 80 L.Ed. 370 (1936); *Ramada Dev. Co. v. United States Fidelity & Guar. Co.,* 626 F.2d 517, 521 (6th Cir.1980). This court believes this to be sound law and applicable to federal government contracts.[3]

Discharges are determined on a *pro tanto* basis. "The culpable surrender or impairment of security by a creditor results in a *pro tanto* reduction in the suret[y's] obligations by the amount of the released collateral." *St. Paul Fire & Marine Ins. Co. v. United States,* 646 F.2d 1064, 1074 n. 14 (5th Cir.1981). Courts use the *pro tanto* release rule because a material departure from the contract's terms deprives the surety of the inducement to perform which inducement the contractor would otherwise have, and destroys or impairs the value of the security taken which may serve as a means of protecting the surety from liability. *E.g., National Union Indem. Co. v. G.E. Bass & Co.,* 369 F.2d 75, 77 (5th Cir.1966).

■ Mere immaterial or technical departures from the contract not resulting in any harm to the surety will not release the surety from its obligations under the bond. *Ramada,* 626 F.2d at 521. Although a surety relies on the contract's provisions in

---

**3.** The court could not locate any opinions of the United States Court of Appeals for the Federal

Circuit or the Court of Claims on this issue nor, apparently, could the parties.

guaranteeing the contractor's obligations, the surety must show harm to be discharged from liability because its rights are equitable, and not contractual, in nature. *See Royal Indem. Co.* 208 Ct.Cl. at 824, 529 F.2d at 1320; *Argonaut,* 193 Ct.Cl. at 493, 434 F.2d at 1367. Prejudice or harm to the surety is defined as a material increase in the surety's risk, *i.e.,* in it's contingent liability or obligation to insure performance. *St. Paul Fire & Marine Ins.,* 646 F.2d at 1073; *Continental Bank & Trust Co. v. American Bonding Co.,* 605 F.2d 1049, 1056 (8th Cir.1979); *see United States v. Reliance Ins. Co.,* 799 F.2d 1382, 1386 (9th Cir.1986).

■ One special factor to consider in determining whether the premature release of retained funds increased plaintiff's risk focuses on how the contractor used the monies. *Argonaut Ins. Co. v. Cloverdale,* 699 F.2d 417, 419 (7th Cir.1983). In *St. Paul Fire & Marine Ins.,* 646 F.2d at 1073, the court relieved the surety of liability because it found that defendant obligee knew of the obligor's practice of repaying one loan with proceeds from the collateral securing another loan, which had the effect of stripping the second loan of its security. If, however, the retainage was used in the advancement of the contract work and it prolonged or prevented an otherwise eventual default by the contractor, the amount at risk to plaintiff may be unaffected. *Cloverdale,* 699 F.2d at 419.

In this case, defendant and plaintiff had a common interest in Westech's performance. Therefore, to the extent Westech used the retainage to attempt to complete the original contract work which it would not have been otherwise able to do, plaintiff may not have suffered harm and may not be discharged because (1) the resulting reprocurement costs may be that much less, and (2) the premature payments made may not have removed in any degree the incentive Westech had prior thereto for completing the contract. *See generally* Arant, *Rationale of the Rule That An Obligee's Premature Payment Discharges His Surety,* 80 U.Pa.L.Rev. 842, 857 (1932); *see also Cloverdale,* 699 F.2d at 419–20; *Ramada Dev. Co.,* 626 F.2d at 522. Continuous prepayments constitute, however, a material departure from the contract, even if the payments are used to buy materials subsequently incorporated into the contract work. *National Union Indem.,* 369 F.2d at 78. According to the Sixth Circuit in *National Union,* to hold otherwise would be to render the breached contract provision meaningless. *Id.*

The manner in which Westech used the retainage is critical in determining the extent of the harm suffered by plaintiff. Any other rule would be both harsh and unjust, *Ramada,* 626 F.2d at 522 (quoting *St. John's College v. Aetna Indem. Co.,* 201 N.Y. 335, 94 N.E. 994, 996–97 (1911)), because it might have been in interest of both plaintiff and defendant to have kept Westech on the job as long as possible, even if Westech had financial difficulties, and because plaintiff's rights of subrogation must be balanced against defendant's rights to contract performance.

The trial record gave short shrift to the issue of the extent of plaintiff's harm caused by defendant's premature release of the retainage. The parties obviously disagreed though on how the retainage was used. Defendant contended that it released the retainage in good faith to permit Westech to pay its subcontractors and to alleviate Westech's cash flow problems due to its extensive overtime expense in trying to comply with the September 30th completion date. According to defendant, Westech's performance was satisfactory at the time. There was no indication Westech would not have been able to have finished the work which was eighty-five percent complete some seven and one-half months before Westech abandoned the project. Defendant concluded that it was justified in releasing all retainages in order to assure project completion and thus benefit Westech, its subcontractors and itself.[4] Plain-

---

4. The court doubts that the contracting officer considered the effect of the premature release of the retained funds on plaintiff but had he done so, in all likelihood, he would have determined the release to also benefit plaintiff for the same reason.

tiff concluded that defendant released the retainage to allow Westech to pay for its increased material costs and overtime expenses due to a delay and concomitant acceleration of work caused by defendant and that defendant financed some of its progress payments with the retainage because at the time it did not have the necessary funds allocated to pay for Westech's additional costs and its (defendant's) various modifications in contract specifications. Plaintiff pointed out to the court that because it paid over $2,000,000 to subcontractors and materialmen under its payment bond, Westech could not possibly have used the retainage for that purpose.

Certain evidence indicate at this time that it is both plausible and probable that Westech used part of the retainage for overtime expenses. For example, defendant's summary of pay estimate number fifteen states that the progress payment described therein included a $395,057 reduction in retainage "to pay for a 30 September, 1983 completion date." Likewise, it can be inferred from the contracting officer's affidavit and an intra-office memorandum that defendant released the retainage, at least in part, as compensation for Westech's overtime expenses while it was in the process of allocating more funds for both contract modifications and overtime expenses. Supplemental funds were allocated and disbursed to Westech only several months after the retainage was released. This evidence, however, does not conclusively establish that Westech spent all retainages on overtime expenses, and none on labor or materials needed for original contract work. The contracting officer's affidavit suggests that only part of the retainage was used for acceleration costs pending receipt of a formal claim. Yet, the court has no idea what percentage of the retainage was spent on acceleration costs.

More importantly, defendant has only admitted to being partly responsible for the eight month delay in approving contract drawings; thus, it would only be partly at fault for Westech's overtime expenses all of which might have been funded by the retainage. According to defendant Westech contributed to the delay by not making timely submittal of acceptable drawings. This court cannot conclude from any of the exhibits how much delay defendant caused that would need to be evaluated in conjunction with the four month extension defendant granted to Westech. Further, defendant has presented evidence that some of the delay may have been caused by unanticipated costs, attributable to the original plans rather than an alteration in the nature of the work. Normally, such expenses would not have materially increased the surety's risk. *See Continental Bank*, 605 F.2d at 1056.

The evidence does not relate the extent to which defendant financed progress payments with the retainage. In fact, during the period the retainage was released, several pay estimates show that defendant paid for part of the progress payments with funds other than the retainage. Defendant also had $100,000 on hand which may have been used to finance contract modification costs. Plaintiff correctly stated that several of defendant's memoranda show that defendant was in urgent need of monies to fund changes made in the contract work and to keep Westech working. Yet, no evidence suggests that defendant ran out of funds before or during June and July of 1983 when the retainage was released. Only in September of 1983, after newly appropriated funds had been disbursed, is it clear that defendant exhausted monies allocated to the contract work.

In summary, it is not clear how much retainage was spent on overtime expenses and/or contract modifications, instead of on the original work. The court can only guess at what proportion of the overtime expenses were caused by defendant and not Westech. Consequently, additional findings of fact are necessary to enable the court to determine to what extent defendant's actions were prejudicial to plaintiff's interest. Those findings cannot be made from the record presently before the court.

## CONCLUSION

The court concludes that defendant prematurely released the retainage and plaintiff has not adequately shown the absence of genuine issues of material fact. Plaintiff's partial motion for summary judgment is denied.

IT IS SO ORDERED.