FIREMAN'S FUND INSURANCE
COMPANY, Plaintiff–Appellee,

v.

The UNITED STATES,
Defendant–Appellant.

No. 90–5010.

United States Court of Appeals,
Federal Circuit.

July 16, 1990.

Rehearing Denied Aug. 27, 1990.

Stephen B. Sutton, Gage & Tucker, Kansas City, Mo., argued for plaintiff-appellee. With him on the brief were Charles D. Ablard and Paul Scott Kelly, Jr.

Helene M. Goldberg, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellant. With her on the brief

We express no opinion as to which, if any, of     the solutions to this complex problem we favor.

were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Director.

Before MAYER and PLAGER, Circuit Judges, and SMITH, Senior Circuit Judge.

## OPINION

MAYER, Circuit Judge.

The United States appeals the judgment of the United States Claims Court, 15 Cl.Ct. 225 (1988), holding that the Department of the Army's release of retainage was a departure from a construction contract that prejudiced the contractor's surety and discharged it *pro tanto* from its obligations under a performance bond. We reverse.

### Background

On March 16, 1982, the Department of the Army (government) awarded Westech Corporation a contract to build a pressure recovery system for the high energy laser test facility at White Sands Missile Range, New Mexico. As required by the contract and pursuant to the Miller Act, 40 U.S.C. §§ 270a–270d (1982), Fireman's Fund Insurance Company (Fireman's Fund) agreed to be Westech's surety by issuing both payment and performance bonds. The performance bond, relevant here, named Westech as principal and the United States as obligee.

The construction contract provided that the government would make periodic progress payments to Westech but retain ten percent of each, unless the contractor made satisfactory progress during a payment period. In that event, the contracting officer could authorize payment in full. Westech performed satisfactorily through the first fourteen pay periods, but the government nevertheless retained ten percent of Westech's monthly payments. Thereafter, in May of 1983, because overtime expenditures necessary to meet the contract's completion date were causing cash flow problems, Westech requested that the government pay it semi-monthly and release the funds previously retained under the contract. The government agreed. When the request was made, the project was about eighty-five percent complete, there was no indication that Westech would be unable to complete the contract, and the government believed releasing the retainage would redress complaints it had received from Westech subcontractors about late or nonpayments.

Throughout June and July of 1983, the government released $563,822, the full amount of the retainage. Notwithstanding continued complaints of nonpayment by Westech subcontractors and suppliers, the government also paid Westech's subsequent semi-monthly progress payments in full. Unfortunately, neither of these accommodations was sufficient: by mid-December of 1983, the project had faltered and Westech employees and subcontractors had left the site.

In response to two routine progress inquiries—in March of 1983, before releasing the retainage, and in October of 1983, after doing so—the government had shared with Fireman's Fund its knowledge of payment problems between Westech and its subcontractors. But Fireman's Fund did not notify the government until December 22, six days after Westech had abandoned the contract, that it was aware of Westech's unpaid debts and that the government should not make any further payments to Westech without its written consent. Neither in the December 22 letter nor in either of the two earlier general status inquiries did Fireman's Fund mention retainage; nor did it, in the October and December communications, question the government's previous release of the retained funds.

Nevertheless, the government honored Fireman's Fund's request and withheld Westech's first December progress payment. When no further progress had been made on the project and Fireman's Fund and Westech had been given notice, the government terminated the contract for default on December 29 and asked Fireman's Fund to resume work no later than January 10, 1984. Fireman's Fund declined to assume the contract on such short notice, thereby defaulting under its performance bond. It did, however, fulfill its obligations under the payment bond by satisfy-

ing over $2 million in subcontractor and supplier claims against Westech.

The government subsequently reprocured the remainder of the contract. The reprocurement contractor substantially completed the project in April of 1984 and in a final decision dated September 24, 1985, the contracting officer assessed $583,903 in excess reprocurement costs against Fireman's Fund. Fireman's Fund challenged the assessment in the Claims Court, alleging that the government's premature release of the retainage breached the bonded contract and prejudiced its interests. Accordingly, it argued that the court should release it from liability on its performance bond to the extent of the prejudice.

The Claims Court held that the government had materially departed from the contract by releasing the retainage to Westech, thereby prejudicing Fireman's Fund and substantially discharging it from liability on the performance bond. The court invoked the so-called *pro tanto* discharge rule: "if the obligee departed from or altered the contractual provisions relating to payments and/or the security of retained funds, a surety is discharged to the extent it can show injury, loss, or prejudice." 15 Cl.Ct. at 230. Therefore, based on the parties' stipulations that (1) $346,251.19 were the completion costs within the scope of the contract, (2) through July 1983 the government released all funds retained under the contract in the amount of $563,822, and (3) Westech used $264,384 of the released retainage for purposes unrelated to contract performance, the Claims Court entered judgment for the government only in the amount of $81,867.19 plus interest. Claiming entitlement to the full amount of its completion expenses, the government appeals.

## Discussion

### I.

The Claims Court recognized that it is unprecedented in this court to apply the *pro tanto* discharge rule to government contracts. It relied instead on cases from the Sixth, Seventh, and Eighth Circuits ap-

plying the rule to private contracts, *see Ramada Dev. Co. v. United States Fidelity & Guar. Co.*, 626 F.2d 517 (6th Cir.1980), *Argonaut Ins. Co. v. Town of Cloverdale*, 699 F.2d 417 (7th Cir.1983), *Continental Bank & Trust Co. v. Calwood Leisure Ass'n, Inc.*, 605 F.2d 1049 (8th Cir.1979), and from the Fifth and Ninth Circuits applying the rule to federal government contracts, *see St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp.*, 646 F.2d 1064 (5th Cir.1981), *United States v. Reliance Ins. Co.*, 799 F.2d 1382 (9th Cir.1986). We do not decide whether the *pro tanto* discharge rule may be applied where the government is a party to the bonded contract because, even if it may, it would not discharge Fireman's Fund of liability in this case.

As recited by the Claims Court and emphasized by Fireman's Fund, "[i]t is well-settled in many jurisdictions that *if the obligee departed from or altered the contractual provisions relating to payments and/or the security of retained funds*, a surety is discharged from its obligations only to the extent it can show injury, loss, or prejudice." 15 Cl.Ct. at 230 (emphasis added). Thus, for the rule to operate to Fireman's Fund's benefit, the government must have departed from the terms of the bonded contract. The Claims Court thought the government had done so by releasing the full amount of the retainage to Westech in June and July of 1983. *Id.* at 229. We think not.

Paragraph 7(c) of the superseding general provision of the construction contract provides:

> In making such progress payments, there shall be retained 10 percent (10%) of the estimated amount until final completion and acceptance of the contract work. However, if the Contracting Officer finds that satisfactory progress was achieved during any period for which a progress payment is to be made, he may authorize such payment to be made in full without retention of a percentage. Also, whenever the work is substantially complete, the Contracting Officer shall retain an amount he considers adequate

for the protection of the Government and, at his discretion, may release to the Contractor all or a portion of any excess amount....

Contrary to the trial court's assertion that "the contract expressly stated that defendant had no discretion to release the retainage accumulated during the first fourteen payments until the contract work was substantially complete," 15 Cl.Ct. at 229, paragraph 7(c) is silent about what the contracting officer may do with retainage after he has accumulated it but before the contractor has substantially completed the contract. The parties agree that substantial completion did not occur until April of 1984, nine months after release of the retainage and four months after Westech's termination for default. It is also undisputed that Westech's performance during the first fourteen pay periods was satisfactory. Hence, the government could have chosen not to retain funds for any of those periods. In that event, Fireman's Fund would have been in precisely the position it now finds itself. Therefore, the government argues, the contract's silence should not be interpreted to force a contrary result. We agree.

It is true that retainage is an incentive to complete the contract, but it is equally true that contractors may need full progress payments to finance the work. In this case, the government believed the contract might not be completed unless it released the retainage to alleviate Westech's cash flow problems. It may be that, ideally, the government should hold retainage until the work is substantially complete instead of releasing it when "perhaps fleeting, temporary satisfactory progress during one or a few pay periods is achieved." *Id.* at 230. But the government has considerable leeway in administering its contracts.

> During performance, the Government's role is substantially different from that of a mere stakeholder of a final contract payment. The [Government] has an important interest in the timely and efficient completion of the contract work. In furtherance of this interest, the Government contracts for a broad range of rights which are designed to promote continuation of the contract work. These provisions give the Government considerable discretion and flexibility in administering the contract. Public policy supports this flexibility in light of the various unforeseen circumstances which may hinder performance.

*Argonaut Ins. Co. v. United States,* 434 F.2d 1362, 1367, 193 Ct.Cl. 483 (1970); *see also Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1164 (Fed.Cir.1985); *United States Fidelity & Guar. Co. v. United States,* 676 F.2d 622, 628, 230 Ct.Cl. 355 (1982). We are unwilling to read into the contract a limitation on discretion that the parties did not themselves contemplate.

■ Apart from the *pro tanto* discharge rule—which, again, we find no occasion to peruse today—the government as obligee owes no equitable duty to a surety like Fireman's Fund unless the surety notifies the government that the principal has defaulted under the bond. It is irrelevant whether the surety claims a right to funds during performance of the contract, or after it is completed when the government functions as a "stakeholder" of funds owed but not yet paid. In either event, notice by the surety is essential before any governmental duty exists. *See Balboa,* 775 F.2d at 1162 (duty arising during performance); *United States Fidelity & Guar. Co. v. United States,* 676 F.2d at 628 (same); *Royal Indemnity Co. v. United States,* 529 F.2d 1312, 1319–21, 208 Ct.Cl. 809 (1976) (same); *United States Fidelity & Guar. Co. v. United States,* 475 F.2d 1377, 1384, 201 Ct.Cl. 1 (1973) (same); *Argonaut Ins.,* 434 F.2d at 1368 (same). *See also American Fidelity Fire Ins. Co. v. United States,* 513 F.2d 1375, 1379, 206 Ct.Cl. 570 (1975) (government as stakeholder owes duty to surety); *Great American Ins. Co. v. United States,* 492 F.2d 821, 824, 203 Ct.Cl. 592 (1974) (same); *Fireman's Fund Ins. Co. v. United States,* 421 F.2d 706, 190 Ct.Cl. 804 (1970) (same); *Home Indemnity Co. v. United States,* 376 F.2d 890, 893, 180 Ct.Cl. 173 (1967) (same); *United Pacific Ins. Co. v. United States,* 362 F.2d 805, 809, 176 Ct.Cl. 176 (1966) (same); *National*

*Union Fire Ins. Co. v. United States*, 304 F.2d 465, 468, 157 Ct.Cl. 696 (1962) (same).

▮ Fireman's Fund did not notify the government of Westech's failure to pay its subcontractors and suppliers or ask that payments to Westech be withheld until December 22, 1983, almost five months after the government had fully released the retainage which Fireman's Fund now claims. That some subcontractors and suppliers had informed the government of Westech's payment deficiencies prior to the release of the retainage does not substitute for notice by the surety and does not trigger the government's equitable duty to act with reasoned discretion toward it. Fireman's Fund simply cannot rely on Westech's subcontractors or the government to protect its interests. By definition and agreement the surety protects the government's interest, not the other way around.

We see no reason to impose on the government a duty toward the surety whenever a subcontractor or supplier complains of late or nonpayment by the contractor. Only the contract should limit the government's flexibility in resolving payment disputes so minor, and perhaps so inevitable, that the surety itself doesn't consider the contractor's role in them a potential default under the bond. Only when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty. The surety knows best when this may occur; consequently, only notice by the surety triggers the government's equitable duty.

## II.

▮ Fireman's Fund argues alternatively that the government owed it a *contractual* duty not to release the retainage until after the contract was substantially completed. Because the judgment of the trial court rested on Fireman's Fund's putative equitable rights—"[a]lthough a sure-

ty relies on a contract's provisions in guaranteeing the contractor's obligations, the surety must show harm to be discharged from liability because its rights are equitable, and not contractual, in nature," 15 Cl.Ct. at 231—the court did not address this argument. Indeed, it is unclear whether Fireman's Fund even presented its contractual theory to the trial court. But as the appellee, it may on appeal support the judgment with any argument the law or the record will sustain. *United States v. New York Tel. Co.*, 434 U.S. 159, 166, 98 S.Ct. 364, 369, 54 L.Ed.2d 376 (1977); *Marsh–McBirney, Inc. v. Montedoro–Whitney Corp.*, 882 F.2d 498, 504 n. * (Fed.Cir.1989). Where the grounds urged in support of the judgment have not been presented to and passed upon by the trial court, we prefer not to address them in the first instance. *See Granfinanciera, S.A. v. Nordberg*, — U.S. ——, 109 S.Ct. 2782, 2788–89, 106 L.Ed.2d 26 (1989). However, here a remand would serve no useful purpose. The parties have fully briefed and argued Fireman's Fund's contractual rights theory and, were we to adopt it in place of the Claims Court's rationale, it would not affect the scope of either party's relief. Furthermore, the issue is purely legal and fairly straightforward, and the appellate record on it is complete.

"Although it is conceivable that under certain circumstances a surety could assert rights against the Government under the third-party beneficiary rule, or even as one in privity of contract with the Government," *Balboa*, 775 F.2d at 1160, the documents and facts of record here neither expressly nor implicitly establish the existence of an independent contract between the government and Fireman's Fund. Fireman's Fund points to no document in which the government undertook any obligation to it. The bonded contract was between Westech and the government. The payment * and performance bonds were be-

---

* In contrast to a performance bond, which is intended to protect the government, a payment bond is intended to protect persons supplying labor and materials to the contractor. *See* 40 U.S.C. § 270a(a). Thus, the government is the

intended third party beneficiary of the performance bond and the subcontractors and suppliers of a contractor are the intended third party beneficiaries of the payment bond. Fireman's Fund has become subrogated to Westech's con-

tween Westech and Fireman's Fund. And while the government is identified as the intended third-party beneficiary of the performance bond, it did not sign the bond or undertake any obligation to Fireman's Fund in it. Moreover, the bond requires Westech to fulfill its contract with the government; it does not similarly require the government to fulfill its obligations toward Westech, whether for the benefit of Fireman's Fund or any other party. Thus, Fireman's Fund is neither the intended third-party, nor the direct, beneficiary of any promise by the government, whether contained in the bonded contract or the performance bond.

To the extent Fireman's Fund argues an implied-in-fact contract with the government exists, it also fails. The requirement for payment and performance bonds on contracts like Westech's does not, on these facts, imply a contract between the government and the bondsman. *See Ransom v. United States*, 900 F.2d 242, 244–45 (Fed. Cir.1990). Finally, coming full circle, even if Fireman's Fund were able to establish the existence of a contractual relationship with the government incorporating the terms of the bonded contract, it could not prevail because the release of the retainage was not a departure from the contract.

## *Conclusion*

Accordingly, the judgment of the Claims Court is reversed.

REVERSED.

---

tractual rights against the government by paying over $2 million to Westech's subcontractors and suppliers, *see, e.g., United States Fidelity & Guar. Co. v. United States*, 475 F.2d 1377, 1384, 201 Ct.Cl. 1 (1973), but these rights avail it little because the government has already paid Westech what Fireman's Fund seeks. Therefore, as Fireman's Fund realizes, it must establish that it has rights *of its own* against the government, independent of the contractual rights of Westech to which it has succeeded, to recover the retainage already paid to Westech.