ARCHER, Chief Judge,
dissenting.
Although I agree with the majority that National Surety cannot recover under a third-party beneficiary claim, I respéctfully *1549 dissent because I believe the majority has confused two distinct areas of surety law, equitable subrogation and discharge, neither of which is applicable in this case. Compare Restatement (Third) of Suretyship and Guaranty §§ 26-31 (1996) (discussing surety’s rights under subrogation) with id. §§ 39-A6 (1996) (discussing surety’s rights under discharge).
I
THIRD-PARTY BENEFICIARY STATUS
The majority affirms the judgment of the Court of Federal Claims on a different ground and implicitly rejects that court’s third-party beneficiary approach. I believe the rejection of this approach merits further discussion. Although decisions of this court have left the door open to a third-party beneficiary claim by a surety, see Fireman’s Fund Ins. Co. v. United States, 909 F.2d 495, 499 (Fed.Cir.1990); Balboa Ins. Co. v. United States, 775 F.2d 1158, 1160-61 (Fed.Cir. 1985), it has never found a surety so qualified. I reach the same conclusion in this case.
Under the law of contracts, there are two types of third-party beneficiaries to a contract, intended and incidental.[3] Holbrook v. Pitt, 643 F.2d 1261, 1270 n. 17 (7th Cir.1981); Restatement (Second) of Contracts § 302 (1981). An intended third-party beneficiary of a government contract may bring suit against the government under 28 U.S.C. § 1491 for breach of contract. Hebah v. United States, 192 Ct.Cl. 785, 428 F.2d 1334, 1339 (1970). An incidental beneficiary, however, has no legal right to enforce a contract against either of the contracting parties. AT. Kearney, Inc. v. International Bus. Machs. Corp., 73 F.3d 238, 242 (9th Cir. 1995); Holbrook, 643 F.2d at 1270; Restatement (Second) of Contracts § 315 (1981). To determine whether a third party is an intended beneficiary, we look to the contract itself to determine whether it reflects an intent to benefit the third party. See Slattery v. United States, 35 Fed. Cl. 180, 184 (1996).
Third-party beneficiary status has been characterized as an “exceptional privilege.” Montana v. United States, 33 Fed. Cl. 82, 86 (1995) (quoting German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195 (1912)). Thus, demonstration of such status is an onerous burden. See Maniere v. United States, 31 Fed. Cl. 410, 417 (1994). The exceptional nature of this status is especially relevant in suits against the United States because, as the Court Federal of Claims recognized, “if the United States did not intend to allow a contract action against it by an entity that is not a party to the contract, then it can be argued that the United States never waived sovereign immunity so as to authorize such a suit.” National Leased Housing Assoc. v. United States, 32 Fed. Cl. 454, 462 (1994).
In this case, the Court of Federal Claims found support for its holding that National Surety was a third-party beneficiary in Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896):
The law upon this subject seems to be, the reserved per cent to be withheld until the completion of the work to be done is as much for the indemnity of him who may be a guarantor of the performance of the contract as for him for whom it is to be performed.
Id. at 239, 17 S.Ct. at 147. This language cited from Prairie State, however, related to an equitable subrogation claim, not a third-party beneficiary claim. The issue in this case is whether National Surety was an intended beneficiary of the retainage provision. Because Prairie State involved equitable subrogation, the intent of the parties was never at issue. Consequently, the decision is not controlling in this case.
Because the first sentence of the G-7(A) clause does not expressly state that protection of the government was the purpose of the retainage, National Surety argued, and the Court of Federal Claims found, that this demonstrated an intent by the parties to protect the interest of National Surety instead of the government. This analysis, *1550 however, suffers fatally from conjecture. An equally valid argument can be made that later in the clause there is language that the government’s interest was being protected and that this applies to the entire clause. In any event, the absence of an explicit statement regarding the protection of the government in the first sentence is at best inconclusive and does not establish an intent to benefit the surety.
The Court of Federal Claims also indicated in its opinion that the government’s promise to withhold the retainage was inconsistent with the usual retainage clause where the government has discretion over the timing for release of the retained amounts. The court cited Fireman’s Fund Insurance Co. v. United States, 909 F.2d 495 (Fed.Cir.1990), in this regard to support its view that the government would have been better served by assuring it had discretion to release the retainage if the contractor encountered difficulty in completing the project. Because the court believed the government had contracted away this discretion, it concluded that the parties must have intended to benefit National Surety. Again the analysis is speculative and unpersuasive. Whatever the reason for the modified retainage clause there is nothing in that clause or in any proof relating to its inclusion that shows an intent of the parties to benefit the surety. Thus, in my view, it has not been shown that National Surety was intended to be a third-party beneficiary to the contract.
II
As recognized by the majority, “the traditional means of asserting a surety’s claim is under the equitable doctrine of subrogation.” Balboa, 775 F.2d at 1161, The majority’s analysis, however, confuses equitable subrogation and discharge, two principles of surety law that are distinct. Under equitable subrogation, “a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed.” Pearlman v. Reliance Ins. Co., 371 U.S. 132, 137, 83 S.Ct. 232, 235, 9 L.Ed.2d 190 (1962). Under this theory, a surety “stands in the place of one whose claim he has paid” and “cannot acquire by subrogation what another whose rights he claims did not have.” United States v. Munsey Trust Co., 332 U.S. 234, 242, 67 S.Ct. 1599, 1603, 91 L.Ed. 2022 (1947).
In contrast, the discharge doctrine excuses, to the extent of the prejudice to the surety, the obligation of the surety to perform under the bond when there has been an impairment of the surety’s rights under the contract through, for example, modification of the bonded contract or impairment of collateral. See National Union Indem. Co. v. G.E. Bass and Co., 369 F.2d 75, 77 (5th Cir.1966); Restatement (Third) of Suretyship and Guaranty §§ 41(b), 42 (1996). This right belongs to the surety and is not derivative of either the government or the contractor; hence, it is distinct from equitable subrogation. The majority opinion confuses these two principles and improperly treats pro tan-to discharge as merely a measure of recovery under equitable subrogation. I consider both in turn and conclude that neither applies in this case.
A. Equitable Subrogation
Under equitable subrogation, a surety is entitled to a retainage held by the government because “[i]f the United States had been compelled to complete the work, its right to forfeit [the retainage], and apply the accumulations in reduction of the damage sustained, remained. The right of [the surety] to subrogation, therefore, would clearly entitle him, when, as surety, he fulfilled the obligation of [the contractor] to the government, to be substituted to the rights which the United States might have asserted against that fund.” Prairie State, 164 U.S. at 232-33, 17 S.Ct. at 144; see Restatement (Third) of Suretyship and Guaranty § 31 (1996) (noting secondary obligor’s right to return performance of duty still owed by obligee); cf. Balboa, 775 F.2d at 1161.
Because the surety stands in the place of the government, however, its recovery under equitable subrogation is limited to funds presently in the possession of the government. See Balboa, 775 F.2d at 1163; see also Fireman’s Fund, 909 F.2d at 500 n. * ([T]hese [subrogation] rights avail [Fireman’s Fund] little because the government *1551 has already paid Westech what Fireman’s Fund seeks.” (emphasis added)). As the Court of Federal Claims found, the government had already paid out the retainages to the contractor before the time of the default. Consequently, none of these funds remained in the government’s possession to which National Surety’s equitable rights could apply.
A surety may be able to recover funds already paid if the disbursement was improperly made, but only after notice to the government. See, e.g., Home Indem. Co. v. United States, 180 Ct.Cl. 173, 376 F.2d 890 (1967).[4] Contrary to the majority opinion, notice is required under either a payment or performance bond when the surety, knowing of or anticipating the contractor’s default, wants the government to cease progress payments to the contractor, entitling the surety to these withheld payments. See Ransom v. United States, 900 F.2d 242, 245 (Fed.Cir. 1990). As explained in Fireman’s Fund:
Only when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty. The surety knows best when this may occur; consequently, only notice by the surety triggers the government’s equitable duty.
909 F.2d at 499 (emphasis added). Without notice, the government has no reason to withhold payment; withholding payment potentially hinders the government’s interest in having the contract completed by limiting the resources available to the contractor.
The majority offers no reason why notice is not required and instead attempts to limit Fireman’s Fund to its facts by, again, confusing equitable subrogation with discharge. According to the majority, this case differs from Fireman’s Fund because the government “never met”[5] the contract condition, which, unlike the contract in Firemans Fund, does not permit the government to release the funds. This distinction, however, is irrelevant to an analysis of equitable subrogation: instead it is relevant to an analysis of discharge, i.e., whether the government has breached or altered the underlying agreement so as to release the surety to some degree from its obligation. See, e.g., Argonaut Ins. Co. v. Town of Cloverdale, 699 F.2d 417, 419 (7th Cir.1983) (noting the surety “is discharged if the obligee under the suretyship contract ... makes payments to the principal ... beyond those provided for in the contract”). In discussing the notice requirement, the Fireman’s Fund court was specifically addressing, and rejecting, equitable subrogation as alternative to pro tanto discharge as a basis for the judgment:
“Apart from the pro tanto discharge rule — which, again, we find no occasion to peruse today — the government as obligee owes no equitable duty to a surety like Fireman’s Fund unless the surety notifies that the principal has defaulted on the bond. ... [Njotice by the surety is essential before any governmental duty exists.”
Fireman’s Fund, 909 F.2d at 498 (emphasis added). Nothing in the opinion suggests that the notice requirement is limited as the majority suggests — it is a prerequisite to any equitable duty owed by the government.
It is undisputed both that no funds remained in the government’s possession and that National Surety failed to provide the government with notice of Dugdale’s default. Thus, National Surety cannot recover under a claim of equitable subrogation.
B. Discharge
The facts in this ease seem to fit more appropriately a claim for pro tanto discharge. Under the rule of pro tanto discharge, *1552 “[w]here there has been a material departure from contractual provisions relating to payments and the security of retained funds, a compensated surety is discharged from its obligations on the performance bond to the extent that such unauthorized payments result in prejudice or injury.” National Union Indem., 369 F.2d at 77; see United States v. Reliance Ins. Co., 799 F.2d 1382, 1385 (9th Cir.1986) (noting that alteration of the bonded contract must be material and prejudice the surety); United States v. Continental Casualty Co., 512 F.2d 475, 478 (5th Cir. 1975) (“[A] surety is entitled to be subrogated to the benefit of all securities and means of payment under the creditor’s control, and any act by the creditor depriving the surety of this right discharges it pro tanto.”).
The first problem with affording National Surety recovery under a pro tanto discharge claim, however, is that it never made this claim in the Court of Federal Claims. Although a court may affirm a judgment “on any ground which the law and the record permit that would not expand the relief [the prevailing party] has been granted,” United States v. New York Tel. Co., 434 U.S. 159, 166 n. 8, 98 S.Ct. 364, 369 n. 8, 54 L.Ed.2d 376 (1962), the judgment can only be so defended if the ground was “properly raised below,” unless the ease is exceptional, Granfinanciera, S.A v. Nordberg, 492 U.S. 33, 38-39, 109 S.Ct. 2782, 2788-89, 106 L.Ed.2d 26 (1989) (quoting Washington v. Yakima Indian Nation, 439 U.S. 463, 476 n. 20, 99 S.Ct. 740, 749 n. 20, 58 L.Ed.2d 740 (1979)). There is nothing in this case that would make it exceptional and, thus, we should refuse to consider a pro tanto discharge claim.
Moreover, the record does not support such a claim. To begin, I disagree with the majority’s characterization of the facts in this case. The majority states that, although Dugdale did not furnish a project arrow diagram, “Nonetheless, the government did not withhold the ten percent retainage from the progress payments, as the contract required.” The contracting officer, however, received a progress curve as required by clause G-8(A) prior to release of the funds. In so doing, the requirement of clause G-7(A) of the contract for submitting a project arrow diagram was not enforced.
It is not improper, however, for the government to fail to enforce a provision in a contract which is for its own benefit and to accept lesser performance. See Restatement (Second) of Contracts § 84 (1981); see, e.g., Gresham & Co. v. United States, 200 Ct.Cl. 97, 470 F.2d 542, 555 (1972); Heller Int’l Corp. v. Sharp, 974 F.2d 850, 860-61 (7th Cir.1992) (approving jury instruction under Illinois law that “[w]aiver is the intentional relinquishment of a known right” and “is a unilateral act”); Nissho-Iwai Co. v. Occidental Crude Sales, 729 F.2d 1530, 1545 (5th Cir.1984) (“California clearly permits a unilateral waiver of defects in performance.”); cf. Lowey v. Watt, 684 F.2d 957, 970 (D.C.Cir.1982) (“When one party assumes the risk that its contract with another will be found to violate rules of an administrative nature, it may waive offensive provisions that inure solely to its benefit without further consideration from the other party, in order to accomplish the essential purpose of the original contract.”), abrogated on other grounds, National Fuel Gas Supply Corp. v. Federal Energy Regulatory Comm’n, 811 F.2d 1563, 1568-69 (D.C.Cir.1987). See generally E. Allan Farnsworth, Contracts § 8.5 at 586-90 (2d ed.1990). “The waiver of a contract provision requires a decision by a responsible officer assigned the function of overseeing the essentials of contract performance .... ” Gresham, 470 F.2d at 555; see also General Motors Corp., Delco Radio Din, ASBCA No. 15, 807, 72-1 BCA 119405 (holding that government waived reliability criteria through its conduct).
In this case, clause G-7(A) sets forth a prescribed procedure for the release of the retainage requirement. The action of the contracting officer in not insisting on this precise procedural requirement but instead accepting one that was less onerous to the contractor does not mean that the contract was breached. Instead, the contracting officer’s release of the retainage after acceptance of the progress curve effected a waiver of the G-7(A) requirement.
Admittedly, under suretyship law, a surety can recover under the pro tanto discharge *1553 rule if the underlying contract is materially modified,[6] resulting in prejudice to the surety. See National Union Indem., 369 F.2d at 77; M. Michael Egan, Discharge of the Performance Bond Surety, in The Law of Suretyship at 12-8 to 12-11 (Edward G. Gallagher ed., 1993). The appropriate measure of damages is “the extent of loss due to the modification.” St. Petersburg Bank & Trust Co. v. Boutin, 445 F.2d 1028, 1031 (5th Cir. 1971); see Restatement (Third) of Suretyship and Guaranty § 37 (1996).
The record, however, does not reveal the extent of the prejudice, if any, to National Surety or whether the government’s waiver is material. Any possible prejudice is likely de minimis because nothing in the record demonstrates that the substitution of the progress curve for the project arrow diagram significantly increased the surety’s risk. The evidence also fails to demonstrate that the differences between these diagrams are substantial enough to rise to the level of a material alteration. See Ramada Dev. Co. v. United States Fidelity & Guaranty Co., 626 F.2d 517, 521 (6th Cir.1980) (“Mere immaterial or technical departures from the contract, not resulting in any damage to the surety, will not release the surety.”); Argonaut Ins. Co. v. Town of Cloverdale, 699 F.2d 417, 420 (7th Cir.1983) (holding no prejudice to surety though “[t]he contract between the town and HESCO that Argonaut guaranteed does specify requirements that the town did not observe in making the prepayments in issue” because the requirements “appear to be for the town’s protection rather than anyone else’s,” i.e., the surety’s).
Additionally, there is no evidence in the record to suggest that the funds released to Dugdale were used for any other purpose than the contract or that Dugdale’s default was in any way tied to its failure to provide the diagram or the release of the funds:
[t]he principal’s default may be and usually is unrelated to any slackening off due to unauthorized advances and may indeed be retarded rather than accelerated by them. And whether the advances increase the surety’s risk depends on what the principal did with them; if he used them on the project the amount at risk to the surety may be unaffected.
Argonaut, 699 F.2d at 419. Thus, any possible prejudice to National Surety was likely mitigated, if not vitiated. Because the record fails to demonstrate both that the government’s waiver effected a material change and that National Surety was prejudiced in any way by the modification of the contract and the subsequent release of funds, it is not entitled to a pro tanto discharge.
Accordingly, I respectfully dissent from the majority opinion and would reverse the judgment of the Court of Federal Claims.

. Within the category of intended beneficiaries, there is also a distinction made between creditor and donee beneficiaries. 2 Walter H.E. Jaeger, Williston on Contracts § 356, at 826-27 (3d ed.1959). This distinction, however, is not relevant to this discussion.

. In such cases, the impropriety of the government’s release is based in equity and not on a contractual obligation to retain the funds. The release is equitably improper because the government, although it had no other duty to retain the money, released the money after receiving notice of the surety’s interest and thus put the surety’s subrogation rights at risk. See Fireman's Fund, 909 F.2d at 498; Ransom v. United States, 900 F.2d 242, 245 (Fed.Cir.1990). If the retainage is contractually required, however, and the government fails to retain payments, then the surety would have a claim for pro tanto discharge. See Restatement (Third) of Suretyship and Guaranty § 37 (1996).

. As discussed below, I believe that the government unilaterally waived the requirement that the contractor submit the project arrow diagram and relied instead on a less detailed diagram.

. The majority characterizes the effect of the release of the retainage as an impairment of collateral. See Restatement (Third) of Suretyship and Guaranty § 42 (1996). I believe the proper approach to be one of a modification of the underlying obligation. See id. § 41. This difference, however, is irrelevant because the measure of damages under either would be the same — the extent of the prejudice to the surety. See id. § 37(3).