118 F.3d 1542
 41 Cont.Cas.Fed. (CCH) P 77,129
 NATIONAL SURETY CORPORATION, Plaintiff-Appellee,
v.
The UNITED STATES, Defendant-Appellant.
 No. 94-5159.
 United States Court of Appeals,
Federal Circuit.
 July 3, 1997.
 
 Richard L. Lambe, Ulin & Lambe, Seattle, WA, argued, for plaintiff-appellee.
 Thomas P. McLish, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued, for defendant-appellant. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Anthony C. Anikeeff, Assistant Director. Of counsel was Thomas O. Mason.
 Before ARCHER, Chief Judge, NEWMAN and PLAGER, Circuit Judges.
 Opinion for the Court filed by Circuit Judge PAULINE NEWMAN. Dissenting opinion filed by Chief Judge ARCHER.
 PAULINE NEWMAN, Circuit Judge.
 
 
 1
 The government appeals the decision of the United States Court of Federal Claims[1] holding the government liable to the surety for the improper release of retainage for a construction contract upon which National Surety Corporation served as guarantor. The decision of liability is affirmed, albeit on a different ground than that selected by the Court of Federal Claims. We remand for redetermination of the amount of damages.
 
 BACKGROUND
 
 2
 National Surety furnished performance and payment bonds in connection with a contract between Dugdale Construction Company and the Department of Veterans Affairs, for construction of a water distribution system at Fort Harrison, Montana. The construction contract provided that the government would retain ten percent of all progress payments until Dugdale submitted, and the contracting officer approved, a "complete project arrow diagram," which is a detailed schedule of the critical path for performing the contract. The retainage provision was as follows:
 
 
 3
 Clause G-7(A). Payment to Contractor Clause 7 of the General Provisions (Contractor Contract) is supplemented to include the following:
 
 
 4
 Retainage: This contract shall have 10 percent retainage withheld on each progress voucher until the complete project arrow diagram has been approved. Once the schedule has been approved and the Contracting Officer has determined that the Contractor's progress is satisfactory, the Contracting Officer may elect not to withhold any additional retainage. Previous retainage will not be reduced and future payments will be made in full. If during subsequent project updates the Contracting Officer determines that the Contractor's progress is unsatisfactory, he may withhold 10 percent retainage on the current payment request and subsequent payments to protect the interests of the Government and until he again determines that the Contractor's progress is satisfactory.
 
 
 5
 Dugdale did not provide the requisite project arrow diagram. Nonetheless, the government did not withhold the ten percent retainage from the progress payments, as the contract required.
 
 
 6
 Dugdale abandoned the project before its completion, and the government then terminated the contract for default. National Surety completed the construction in accordance with its performance bond, and was paid the difference between the contract price and the payments that had been made to Dugdale, i.e., $126,333, less liquidated damages for late completion. National Surety then filed a claim for the funds that were required to have been retained by the government from the progress payments to Dugdale. The contracting officer did not act on the claim within the statutory period, and National Surety brought suit in the Court of Federal Claims.
 
 
 7
 On cross motions for summary judgment, the Court of Federal Claims held that National Surety was a third party beneficiary of the contract between Dugdale and the government and that the government breached this obligation when it improperly paid the retainage to Dugdale, thereby incurring liability to National Surety. The court awarded as damages the amount that should have been retained ($97,742) plus statutory interest. This appeal followed.
 
 DISCUSSION
 
 8
 In the Court of Federal Claims the parties offered alternative theories of their legal relationships and ensuing liabilities. Although we affirm the court's conclusion as to liability, we do so on application of suretyship principles.
 
 
 9
 * The view that the surety is a third party beneficiary of the contract whose performance it assures is not the usual premise of surety claims against an obligee, although, to be sure, the surety's obligations are affected by that performance. See Arthur Adelbert Stearns, The Law of Suretyship § 1.1 (1951) ("Suretyship may be defined as a contractual relation whereby one person engages to be answerable for the debt or default of another"); Balboa Ins. Co. v. United States, 775 F.2d 1158, 1160 (Fed.Cir.1985) ("suretyship is the result of a three-party agreement").
 
 
 10
 Suretyship law derives from a different legal premise than whether the bonded contract, or any provision thereof, was made for the surety's direct benefit. The surety bond embodies the principle that any material change in the bonded contract, that increases the surety's risk or obligation without the surety's consent, affects the surety relationship. The principles are set forth in, e.g., Gritz Harvestore, Inc. v. A.O. Smith Harvestore Prods., Inc., 769 F.2d 1225, 1230 n. 7 (7th Cir.1985):
 
 
 11
 Where, without the surety's consent, the principal and the creditor modify their contract otherwise than by extension of time for payment
 
 
 12
 . . . . .
 
 
 13
 (b) the compensated surety is
 
 
 14
 (i) discharged if the modification materially increases his risk, and
 
 
 15
 (ii) not discharged if the risk is not materially increased, but his obligation is reduced to the extent of loss due to the modification.
 
 
 16
 (citing Restatement, Security § 128 at 340-41 (1941)). These principles have been elaborated upon in the Third Restatement, including a synthesis of the circumstances under which the surety is entitled to relief against the obligee based on impairment of suretyship status. See Restatement (Third) of Suretyship & Guaranty § 37 (1996). Extensive precedent illustrates the discharge or pro tanto reduction of the surety's obligation, varying in implementation based on the particular facts. The general rule with respect to retainage in construction contracts is the subject of the following example in the Third Restatement:
 
 
 17
 1. S has issued a performance bond with respect to P's contract to construct a house for O for $100,000. Pursuant to the contract between O and P, O is to pay P monthly for the portion of the work completed that month minus a 15 percent "retainage." After completing 60 percent of the project and receiving $51,000 ($60,000 minus the $9,000 retainage) from O, P defaults. S completes the project at a cost to S of $40,000. After S completes the project, O pays the $9,000 retainage to P, who, despite this payment, is insolvent. Had O paid the retainage to P before S completed the project, S would have been discharged to the extent of $9,000 by application of § 38 (impairment of collateral). S has a claim against O for $9,000 because the payment to P would have discharged S from the secondary obligation to that extent.
 
 
 18
 Id. § 37, illus. 1. See, e.g., Home Indem. Co. v. United States, 180 Ct.Cl. 173, 376 F.2d 890, 895 (1967) (United States liable to surety despite the fact that the government had disbursed the retainages); Hochevar v. Maryland Cas. Co., 114 F.2d 948 (6th Cir.1940) (improper release of 15% retainage in construction contract released the surety pro tanto); Maryland Cas. Co. v. Board of Water Commissioners, 66 F.2d 730 (2d Cir.1933) (same).
 
 
 19
 The surety's rights and obligations are not based on third-party beneficiary concepts, but on principles of suretyship law. Applying these principles we conclude, as did the Court of Federal Claims, that the government has incurred liability to the surety. However, on the facts of this case we conclude that damages are fairly measured not by the calculated amount of the required retention, but by the injury, loss, or prejudice to the surety due to the government's failure to implement the required retention.
 
 B
 
 20
 National Surety argued at trial that, based on principles of suretyship and the doctrine of subrogation, it was entitled to the retainage security that was required to have been withheld from the contractor. We agree that this is the appropriate theory of liability. The Supreme Court explained the subrogation right in an early case concerning retainage in a construction contract with the government:
 
 
 21
 [The surety's] right of subrogation, when it became capable of enforcement, was a right to resort to the securities and remedies which the creditor (the United States) was capable of asserting against its debtor, had the security not satisfied the obligation of the contractors; and one of such remedies was the right, based upon the original contract, to appropriate the 10 per cent. retained in its hands. If the United States had been compelled to complete the work, its right to forfeit the 10 per cent., and apply the accumulations in reduction of the damage sustained, remained. The right of [the surety] to subrogation, therefore, would clearly entitle him, when, as surety, he fulfilled the obligation of [the contractor] to the government, to be substituted to the rights which the United States might have asserted against the fund.
 
 
 22
 Prairie State Nat'l Bank v. United States, 164 U.S. 227, 232-33, 17 S.Ct. 142, 144, 41 L.Ed. 412 (1896). See also Balboa Insurance, 775 F.2d at 1161 (discussing the equitable doctrine of subrogation as applied to a bonded government contract).
 
 
 23
 The retainage provision in a bonded construction contract serves to protect the surety as well as the government, and is an interest of the surety that can not be disregarded or diminished by a party to the contract:
 
 
 24
 That a stipulation in a building contract for the retention, until the completion of the work, of a certain portion of the consideration, is as much for the indemnity of him who may be guarantor of the performance of the work, as for him for whom the work is to be performed, that it raises an equity in the surety in the fund to be created, and that a disregard of such stipulation by the voluntary act of the creditor operates to release the sureties, is amply sustained by authority.
 
 
 25
 Prairie State, 164 U.S. at 233, 17 S.Ct. at 145 (citations omitted). In Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) the Court reaffirmed the surety's right to subrogation in such a retention fund:
 
 
 26
 These two cases [Prairie State and Henningsen v. U.S. Fidelity & Guar. Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908) ] therefore, together with other cases that have followed them, establish the surety's right to subrogation in such a fund whether its bond be for performance or payment.
 
 
 27
 Pearlman, 371 U.S. at 139, 83 S.Ct. at 236 (footnote omitted). Indeed, in Pearlman the Court confirmed that the surety's right to subrogation is superior to that of the contractor's bankrupt estate to which the government had paid the retainage.
 
 
 28
 The Court of Claims, by whose precedent we are bound, has long recognized the surety's right to subrogation in the security held by the government. E.g., Continental Cas. Co. v. United States, 145 Ct.Cl. 99, 169 F.Supp. 945 (1959). The subrogation right is equitable, in origin and in implementation, Argonaut Ins. Co. v. United States, 193 Ct.Cl. 483, 434 F.2d 1362, 1367 (1970), and is established when the surety bonds are given. Home Indemnity Co., 376 F.2d at 893:
 
 
 29
 [T]he surety's rights of subrogation relate back to the date of the execution of the surety bonds, and the contractor can give no one a greater right in the retained percentages than that of the surety.
 
 
 30
 The duty devolves upon the government to administer the contract, during the course of its performance, in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded. U.S. Fidelity & Guar. Co. v. United States, 201 Ct.Cl. 1, 475 F.2d 1377, 1384 (1973):
 
 
 31
 During the performance of the contract, the Government has a duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract.
 
 
 32
 The ten percent retainage provision was in the contract between Dugdale and the government when National Surety set the price for and executed its surety bonds. The retainage requirement served as security for performance of the bonded contract, and this requirement contributed to the surety's assessment of the risk involved. The surety was entitled to rely on the government's obligation to retain this percentage in accordance with the terms of the bonded contract, and on its right of subrogation to this security. National Surety's right was fixed upon execution of the surety bonds, and was not dissolved or altered when the government failed to implement the retainage required by the contract. See Balboa Insurance, 775 F.2d at 1161 (subrogation rights encompass funds wrongfully disbursed). The government, with knowledge that Dugdale had not met the contractual condition predicate to release of the retainage, did not defeat National Surety's subrogation right. Home Indemnity, 376 F.2d at 895 (government held liable to surety despite having disbursed the retainages).
 
 
 33
 The government argued at trial that the contract was "implicitly" modified by its release of the retainage, and that the surety was bound thereby. The Court of Federal Claims discussed this theory, and found that the parties "did not even attempt to properly modify the contract." Although the contract requires that modifications be made by written change order (clause 3(a)), that oral modifications are ineffective unless confirmed in writing (clause 3(b)), and that under no other circumstances would the contracting officer's conduct be treated as modifying the contract (clause 3(c)), the government presented no evidence, either to the Court of Federal Claims or to this court, of the requisite procedures. See Mil-Spec Contractors, Inc. v. United States, 835 F.2d 865, 869 (Fed.Cir.1987) ("[A]n oral modification of a written contract, which may be modified only by bilateral written agreement, is ineffective.") (citing SCM Corp. v. United States, 219 Ct.Cl. 459, 595 F.2d 595, 598 (1979)). It is apparent that the government simply departed from the contractually required retainage. See Gritz Harvestore, 769 F.2d at 1230-32 (material alteration in the terms of the principal's obligation, to the detriment of the surety, discharges the surety when the modification materially increases the assumed risk); United States v. Reliance Ins. Co., 799 F.2d 1382, 1385 (9th Cir.1986):
 
 
 34
 As a general rule a surety will be discharged where the bonded contract is materially altered or changed without the surety's knowledge or consent. In addition, where, as here, a compensated surety seeks exoneration, it must show that the alteration caused prejudice or damage. [Citations omitted.]
 
 
 35
 Trinity Universal Ins. Co. v. Gould, 258 F.2d 883, 885 (10th Cir.1958):It is of course almost axiomatic that any change or modification of the construction contract which materially increases a compensated surety's risk discharges the obligation.
 
 
 36
 Surety bonds are integral to the government contracting process, for through the surety system the government enters into arrangements with reduced risk, by drawing on the responsibility and resources of the surety. Contract terms that provide security for the bonded performance can not be ignored, waived, or modified without consideration of the surety's interests. Great American Ins. Co. v. United States, 203 Ct.Cl. 592, 492 F.2d 821 (1974); U.S. Fidelity, 475 F.2d at 1384. The government's failure to retain the required sums during performance of the Dugdale contract was a change in the terms from those on which the surety provided its bonds. When National Surety completed the contract in accordance with its performance bond, it was entitled to the benefit of the contractually-required retainage. The government's improper release of this security does not avoid liability to the surety for losses thereby sustained.
 
 C
 
 37
 The Court of Federal Claims rejected National Surety's subrogation theory, based on the Federal Circuit's statement in Fireman's Fund Ins. Co. v. United States, 909 F.2d 495, 498 (Fed.Cir.1990) that "the government as obligee owes no equitable duty to a surety like Fireman's Fund unless the surety notifies the government that the principal has defaulted under the bond." The Court of Federal Claims found that National Surety did not notify the government that Dugdale had defaulted, and that in accordance with Fireman's Fund it was required to do so.
 
 
 38
 In Fireman's Fund the surety was held to have been required to notify the government that it wished the retainage to be preserved or payments withheld, for absent such notice the government could, in its discretion, "authorize such payment to be made in full without retention of a percentage." 909 F.2d at 497. In Fireman's Fund the government had initially retained ten percent of the progress payments despite satisfactory performance by the contractor. Then, when performance faltered, the government released this past discretionary retainage in order to provide sustenance to the contractor. The surety had been notified of the contractor's faltering performance, yet took no position concerning the retainage or other payments to the contractor until after the contractor had defaulted. On these facts the Federal Circuit held that specific notice from the surety was required, stating that "for the rule [of pro tanto discharge] to operate to Fireman's Fund's benefit, the government must have departed from the terms of the bonded contract." 909 F.2d at 497. The court observed that there had been no such departure. Id.
 
 
 39
 In contrast, Dugdale's bonded contract gave no discretion to the government to depart from the requirement of the ten percent retainage until after the complete project arrow diagram was submitted and approved. That condition was never met.[2] When the contractor abandoned performance before completion, as did Dugdale, and the government had knowledge of the default, as here, and so informed the surety, as here, Fireman's Fund does not impose a further requirement that the surety notify the government that "the principal has defaulted." The holding in Fireman's Fund did not change the rules of subrogation, but simply dealt with the rights and obligations of the parties on the conditions of that case.
 
 
 40
 We conclude that National Surety's right of subrogation was not defeated by the government's release of the retainage in contravention of the terms of the bonded contract. On this ground, we affirm the decision of the Court of Federal Claims on the issue of liability.
 
 D
 
 41
 The Court of Federal Claims awarded, as damages, the full amount of the contractually required retainage. We conclude that National Surety is not automatically entitled to this measure of damages, but that the surety's recovery should be measured by its actual damages attributable to the release of the retainage.
 
 
 42
 Courts and commentators have recognized the difficulties in measuring such damages, and perhaps for this reason there are significant differences among the states and even within states in the extent to which changes in a bonded contract have been held to release the surety or, variously, provide a partial discharge. The trend, particularly for compensated commercial (as compared with personal) sureties, is in the direction of pro tanto discharge measured as set forth in the Restatement (Third) § 42 (Impairment of Collateral):
 
 
 43
 (1) If the underlying obligation is secured by a security interest in collateral and the obligee impairs the value of that interest, the secondary obligation is discharged to the extent that such impairment would otherwise increase the difference between the maximum amount recoverable by the secondary obligor pursuant to its subrogation rights (§§ 27-31) and the value of the secondary obligor's interest in the collateral.
 
 
 44
 Several jurisdictions require that for pro tanto discharge there must have been some injury, loss, or prejudice to the surety following impairment of the security. In Argonaut Ins. Co. v. Town of Cloverdale, 699 F.2d 417 (7th Cir.1983), the court considered whether certain unauthorized advances increased the surety's risk, and concluded that it depended on what the principal did with them; if the sums were expended for the purposes of the contract, the court suggested that the amount at risk to the surety might be unaffected. In Ramada Development Co. v. U.S. Fidelity & Guar. Co., 626 F.2d 517 (6th Cir.1980), the court held that the surety was not released to the extent of the improperly paid retainage because the contractor applied the released funds to progress on the contract. In Home Indemnity, 376 F.2d at 895, the Court of Claims held that the government was liable to the surety for the amount of the retainage, but only to the amount it had been damaged.
 
 
 45
 The Federal Circuit and its predecessor Court of Claims have recognized that subrogation is governed by equitable principles rather than by strict rules of law. See Balboa Insurance, 775 F.2d 1158 and cases cited therein. We conclude that National Surety's recovery should not exceed any losses that ensued, directly or indirectly, from the impairment of the security. Thus it is relevant to consider what the contractor did with the released funds. If the unauthorized payments were expended for the purposes of the contract so that the extent of the surety's subsequent performance was reduced thereby, any injury to the surety would to that extent be mitigated. Account should also be taken of opposite effects, such as whether the unauthorized release reduced the contractor's incentive to complete the contract, thereby increasing the risk to the surety. See Hochevar v. Maryland Casualty Co., 114 F.2d 948 (6th Cir.1940) ("some contend that the surety should have a total defense because of the impossibility of determining with exactitude the degree to which premature payment removes the incentive to perform.") Thus in this case, wherein the retainage set in the bonded contract is improperly released by the government, the government should have the opportunity to establish mitigation based on events following the wrongful release of the retainage. The Court of Federal Claims has not considered National Surety's damages in this light. We vacate the damages award, and remand for redetermination in accordance with these principles.
 
 
 46
 No costs.
 
 
 47
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 48
 ARCHER, Chief Judge, dissenting.
 
 
 49
 Although I agree with the majority that National Surety cannot recover under a third-party beneficiary claim, I respectfully dissent because I believe the majority has confused two distinct areas of surety law, equitable subrogation and discharge, neither of which is applicable in this case. Compare Restatement (Third) of Suretyship and Guaranty §§ 26-31 (1996) (discussing surety's rights under subrogation) with id. §§ 39-46 (1996) (discussing surety's rights under discharge).
 
 
 50
 * THIRD-PARTY BENEFICIARY STATUS
 
 
 51
 The majority affirms the judgment of the Court of Federal Claims on a different ground and implicitly rejects that court's third-party beneficiary approach. I believe the rejection of this approach merits further discussion. Although decisions of this court have left the door open to a third-party beneficiary claim by a surety, see Fireman's Fund Ins. Co. v. United States, 909 F.2d 495, 499 (Fed.Cir.1990); Balboa Ins. Co. v. United States, 775 F.2d 1158, 1160-61 (Fed.Cir.1985), it has never found a surety so qualified. I reach the same conclusion in this case.
 
 
 52
 Under the law of contracts, there are two types of third-party beneficiaries to a contract, intended and incidental.[3] Holbrook v. Pitt, 643 F.2d 1261, 1270 n. 17 (7th Cir.1981); Restatement (Second) of Contracts § 302 (1981). An intended third-party beneficiary of a government contract may bring suit against the government under 28 U.S.C. § 1491 for breach of contract. Hebah v. United States, 192 Ct.Cl. 785, 428 F.2d 1334, 1339 (1970). An incidental beneficiary, however, has no legal right to enforce a contract against either of the contracting parties. A.T. Kearney, Inc. v. International Bus. Machs. Corp., 73 F.3d 238, 242 (9th Cir.1995); Holbrook, 643 F.2d at 1270; Restatement (Second) of Contracts § 315 (1981). To determine whether a third party is an intended beneficiary, we look to the contract itself to determine whether it reflects an intent to benefit the third party. See Slattery v. United States, 35 Fed. Cl. 180, 184 (1996).
 
 
 53
 Third-party beneficiary status has been characterized as an "exceptional privilege." Montana v. United States, 33 Fed. Cl. 82, 86 (1995) (quoting German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195 (1912)). Thus, demonstration of such status is an onerous burden. See Maniere v. United States, 31 Fed. Cl. 410, 417 (1994). The exceptional nature of this status is especially relevant in suits against the United States because, as the Court Federal of Claims recognized, "if the United States did not intend to allow a contract action against it by an entity that is not a party to the contract, then it can be argued that the United States never waived sovereign immunity so as to authorize such a suit." National Leased Housing Assoc. v. United States, 32 Fed. Cl. 454, 462 (1994).
 
 
 54
 In this case, the Court of Federal Claims found support for its holding that National Surety was a third-party beneficiary in Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896):
 
 
 55
 The law upon this subject seems to be, the reserved per cent to be withheld until the completion of the work to be done is as much for the indemnity of him who may be a guarantor of the performance of the contract as for him for whom it is to be performed.
 
 
 56
 Id. at 239, 17 S.Ct. at 147. This language cited from Prairie State, however, related to an equitable subrogation claim, not a third-party beneficiary claim. The issue in this case is whether National Surety was an intended beneficiary of the retainage provision. Because Prairie State involved equitable subrogation, the intent of the parties was never at issue. Consequently, the decision is not controlling in this case.
 
 
 57
 Because the first sentence of the G-7(A) clause does not expressly state that protection of the government was the purpose of the retainage, National Surety argued, and the Court of Federal Claims found, that this demonstrated an intent by the parties to protect the interest of National Surety instead of the government. This analysis, however, suffers fatally from conjecture. An equally valid argument can be made that later in the clause there is language that the government's interest was being protected and that this applies to the entire clause. In any event, the absence of an explicit statement regarding the protection of the government in the first sentence is at best inconclusive and does not establish an intent to benefit the surety.
 
 
 58
 The Court of Federal Claims also indicated in its opinion that the government's promise to withhold the retainage was inconsistent with the usual retainage clause where the government has discretion over the timing for release of the retained amounts. The court cited Fireman's Fund Insurance Co. v. United States, 909 F.2d 495 (Fed.Cir.1990), in this regard to support its view that the government would have been better served by assuring it had discretion to release the retainage if the contractor encountered difficulty in completing the project. Because the court believed the government had contracted away this discretion, it concluded that the parties must have intended to benefit National Surety. Again the analysis is speculative and unpersuasive. Whatever the reason for the modified retainage clause there is nothing in that clause or in any proof relating to its inclusion that shows an intent of the parties to benefit the surety. Thus, in my view, it has not been shown that National Surety was intended to be a third-party beneficiary to the contract.
 
 II
 
 59
 As recognized by the majority, "the traditional means of asserting a surety's claim is under the equitable doctrine of subrogation." Balboa, 775 F.2d at 1161. The majority's analysis, however, confuses equitable subrogation and discharge, two principles of surety law that are distinct. Under equitable subrogation, "a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." Pearlman v. Reliance Ins. Co., 371 U.S. 132, 137, 83 S.Ct. 232, 235, 9 L.Ed.2d 190 (1962). Under this theory, a surety "stands in the place of one whose claim he has paid" and "cannot acquire by subrogation what another whose rights he claims did not have." United States v. Munsey Trust Co., 332 U.S. 234, 242, 67 S.Ct. 1599, 1603, 91 L.Ed. 2022 (1947).
 
 
 60
 In contrast, the discharge doctrine excuses, to the extent of the prejudice to the surety, the obligation of the surety to perform under the bond when there has been an impairment of the surety's rights under the contract through, for example, modification of the bonded contract or impairment of collateral. See National Union Indem. Co. v. G.E. Bass and Co., 369 F.2d 75, 77 (5th Cir.1966); Restatement (Third) of Suretyship and Guaranty §§ 41(b), 42 (1996). This right belongs to the surety and is not derivative of either the government or the contractor; hence, it is distinct from equitable subrogation. The majority opinion confuses these two principles and improperly treats pro tanto discharge as merely a measure of recovery under equitable subrogation. I consider both in turn and conclude that neither applies in this case.
 
 A. Equitable Subrogation
 
 61
 Under equitable subrogation, a surety is entitled to a retainage held by the government because "[i]f the United States had been compelled to complete the work, its right to forfeit [the retainage], and apply the accumulations in reduction of the damage sustained, remained. The right of [the surety] to subrogation, therefore, would clearly entitle him, when, as surety, he fulfilled the obligation of [the contractor] to the government, to be substituted to the rights which the United States might have asserted against that fund." Prairie State, 164 U.S. at 232-33, 17 S.Ct. at 144; see Restatement (Third) of Suretyship and Guaranty § 31 (1996) (noting secondary obligor's right to return performance of duty still owed by obligee); cf. Balboa, 775 F.2d at 1161.
 
 
 62
 Because the surety stands in the place of the government, however, its recovery under equitable subrogation is limited to funds presently in the possession of the government. See Balboa, 775 F.2d at 1163; see also Fireman's Fund, 909 F.2d at 500 n. * ( [T]hese [subrogation] rights avail [Fireman's Fund] little because the government has already paid Westech what Fireman's Fund seeks." (emphasis added)). As the Court of Federal Claims found, the government had already paid out the retainages to the contractor before the time of the default. Consequently, none of these funds remained in the government's possession to which National Surety's equitable rights could apply.
 
 
 63
 A surety may be able to recover funds already paid if the disbursement was improperly made, but only after notice to the government. See, e.g., Home Indem. Co. v. United States, 180 Ct.Cl. 173, 376 F.2d 890 (1967).[4] Contrary to the majority opinion, notice is required under either a payment or performance bond when the surety, knowing of or anticipating the contractor's default, wants the government to cease progress payments to the contractor, entitling the surety to these withheld payments. See Ransom v. United States, 900 F.2d 242, 245 (Fed.Cir.1990). As explained in Fireman's Fund:
 
 
 64
 Only when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty. The surety knows best when this may occur; consequently, only notice by the surety triggers the government's equitable duty.
 
 
 65
 909 F.2d at 499 (emphasis added). Without notice, the government has no reason to withhold payment; withholding payment potentially hinders the government's interest in having the contract completed by limiting the resources available to the contractor.
 
 
 66
 The majority offers no reason why notice is not required and instead attempts to limit Fireman's Fund to its facts by, again, confusing equitable subrogation with discharge. According to the majority, this case differs from Fireman's Fund because the government "never met"[5] the contract condition, which, unlike the contract in Fireman's Fund, does not permit the government to release the funds. This distinction, however, is irrelevant to an analysis of equitable subrogation: instead it is relevant to an analysis of discharge, i.e., whether the government has breached or altered the underlying agreement so as to release the surety to some degree from its obligation. See, e.g., Argonaut Ins. Co. v. Town of Cloverdale, 699 F.2d 417, 419 (7th Cir.1983) (noting the surety "is discharged if the obligee under the suretyship contract ... makes payments to the principal ... beyond those provided for in the contract"). In discussing the notice requirement, the Fireman's Fund court was specifically addressing, and rejecting, equitable subrogation as alternative to pro tanto discharge as a basis for the judgment:
 
 
 67
 "Apart from the pro tanto discharge rule--which, again, we find no occasion to peruse today--the government as obligee owes no equitable duty to a surety like Fireman's Fund unless the surety notifies that the principal has defaulted on the bond. ... [N]otice by the surety is essential before any governmental duty exists."
 
 
 68
 Fireman's Fund, 909 F.2d at 498 (emphasis added). Nothing in the opinion suggests that the notice requirement is limited as the majority suggests--it is a prerequisite to any equitable duty owed by the government.
 
 
 69
 It is undisputed both that no funds remained in the government's possession and that National Surety failed to provide the government with notice of Dugdale's default. Thus, National Surety cannot recover under a claim of equitable subrogation.
 
 B. Discharge
 
 70
 The facts in this case seem to fit more appropriately a claim for pro tanto discharge. Under the rule of pro tanto discharge, "[w]here there has been a material departure from contractual provisions relating to payments and the security of retained funds, a compensated surety is discharged from its obligations on the performance bond to the extent that such unauthorized payments result in prejudice or injury." National Union Indem., 369 F.2d at 77; see United States v. Reliance Ins. Co., 799 F.2d 1382, 1385 (9th Cir.1986) (noting that alteration of the bonded contract must be material and prejudice the surety); United States v. Continental Casualty Co., 512 F.2d 475, 478 (5th Cir.1975) ("[A] surety is entitled to be subrogated to the benefit of all securities and means of payment under the creditor's control, and any act by the creditor depriving the surety of this right discharges it pro tanto.").
 
 
 71
 The first problem with affording National Surety recovery under a pro tanto discharge claim, however, is that it never made this claim in the Court of Federal Claims. Although a court may affirm a judgment "on any ground which the law and the record permit that would not expand the relief [the prevailing party] has been granted," United States v. New York Tel. Co., 434 U.S. 159, 166 n. 8, 98 S.Ct. 364, 369 n. 8, 54 L.Ed.2d 376 (1962), the judgment can only be so defended if the ground was "properly raised below," unless the case is exceptional, Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 38-39, 109 S.Ct. 2782, 2788-89, 106 L.Ed.2d 26 (1989) (quoting Washington v. Yakima Indian Nation, 439 U.S. 463, 476 n. 20, 99 S.Ct. 740, 749 n. 20, 58 L.Ed.2d 740 (1979)). There is nothing in this case that would make it exceptional and, thus, we should refuse to consider a pro tanto discharge claim.
 
 
 72
 Moreover, the record does not support such a claim. To begin, I disagree with the majority's characterization of the facts in this case. The majority states that, although Dugdale did not furnish a project arrow diagram, "[n]onetheless, the government did not withhold the ten percent retainage from the progress payments, as the contract required." The contracting officer, however, received a progress curve as required by clause G-8(A) prior to release of the funds. In so doing, the requirement of clause G-7(A) of the contract for submitting a project arrow diagram was not enforced.
 
 
 73
 It is not improper, however, for the government to fail to enforce a provision in a contract which is for its own benefit and to accept lesser performance. See Restatement (Second) of Contracts § 84 (1981); see, e.g., Gresham & Co. v. United States, 200 Ct.Cl. 97, 470 F.2d 542, 555 (1972); Heller Int'l Corp. v. Sharp, 974 F.2d 850, 860-61 (7th Cir.1992) (approving jury instruction under Illinois law that "[w]aiver is the intentional relinquishment of a known right" and "is a unilateral act"); Nissho-Iwai Co. v. Occidental Crude Sales, 729 F.2d 1530, 1545 (5th Cir.1984) ("California clearly permits a unilateral waiver of defects in performance."); cf. Lowey v. Watt, 684 F.2d 957, 970 (D.C.Cir.1982) ("When one party assumes the risk that its contract with another will be found to violate rules of an administrative nature, it may waive offensive provisions that inure solely to its benefit without further consideration from the other party, in order to accomplish the essential purpose of the original contract."), abrogated on other grounds, National Fuel Gas Supply Corp. v. Federal Energy Regulatory Comm'n, 811 F.2d 1563, 1568-69 (D.C.Cir.1987). See generally E. Allan Farnsworth, Contracts § 8.5 at 586-90 (2d ed.1990). "The waiver of a contract provision requires a decision by a responsible officer assigned the function of overseeing the essentials of contract performance...." Gresham, 470 F.2d at 555; see also General Motors Corp., Delco Radio Div., ASB CA No. 15,807, 72-1 BCA p 9405 (holding that government waived reliability criteria through its conduct).
 
 
 74
 In this case, clause G-7(A) sets forth a prescribed procedure for the release of the retainage requirement. The action of the contracting officer in not insisting on this precise procedural requirement but instead accepting one that was less onerous to the contractor does not mean that the contract was breached. Instead, the contracting officer's release of the retainage after acceptance of the progress curve effected a waiver of the G-7(A) requirement.
 
 
 75
 Admittedly, under suretyship law, a surety can recover under the pro tanto discharge rule if the underlying contract is materially modified,[6] resulting in prejudice to the surety. See National Union Indem., 369 F.2d at 77; M. Michael Egan, Discharge of the Performance Bond Surety, in The Law of Suretyship at 12-8 to 12-11 (Edward G. Gallagher ed., 1993). The appropriate measure of damages is "the extent of loss due to the modification." St. Petersburg Bank & Trust Co. v. Boutin, 445 F.2d 1028, 1031 (5th Cir.1971); see Restatement (Third) of Suretyship and Guaranty § 37 (1996).
 
 
 76
 The record, however, does not reveal the extent of the prejudice, if any, to National Surety or whether the government's waiver is material. Any possible prejudice is likely de minimis because nothing in the record demonstrates that the substitution of the progress curve for the project arrow diagram significantly increased the surety's risk. The evidence also fails to demonstrate that the differences between these diagrams are substantial enough to rise to the level of a material alteration. See Ramada Dev. Co. v. United States Fidelity & Guaranty Co., 626 F.2d 517, 521 (6th Cir.1980) ("Mere immaterial or technical departures from the contract, not resulting in any damage to the surety, will not release the surety."); Argonaut Ins. Co. v. Town of Cloverdale, 699 F.2d 417, 420 (7th Cir.1983) (holding no prejudice to surety though "[t]he contract between the town and HESCO that Argonaut guaranteed does specify requirements that the town did not observe in making the prepayments in issue" because the requirements "appear to be for the town's protection rather than anyone else's," i.e., the surety's).
 
 
 77
 Additionally, there is no evidence in the record to suggest that the funds released to Dugdale were used for any other purpose than the contract or that Dugdale's default was in any way tied to its failure to provide the diagram or the release of the funds:
 
 
 78
 [t]he principal's default may be and usually is unrelated to any slackening off due to unauthorized advances and may indeed be retarded rather than accelerated by them. And whether the advances increase the surety's risk depends on what the principal did with them; if he used them on the project the amount at risk to the surety may be unaffected.
 
 
 79
 Argonaut, 699 F.2d at 419. Thus, any possible prejudice to National Surety was likely mitigated, if not vitiated. Because the record fails to demonstrate both that the government's waiver effected a material change and that National Surety was prejudiced in any way by the modification of the contract and the subsequent release of funds, it is not entitled to a pro tanto discharge.
 
 
 80
 Accordingly, I respectfully dissent from the majority opinion and would reverse the judgment of the Court of Federal Claims.
 
 
 
 [1]
 National Surety Corp. v. United States, 31 Fed. Cl. 565 (1994)
 
 
 [2]
 The dissent argues that it was not necessary for the government to require the submission of the "complete project arrow diagram" (required by clause G-7(A) of the contract) because the contractor submitted and the government accepted a "progress curve" (independently required by clause G-8(A)). We are not told how meeting this lesser performance condition relieved the contractor of its obligation concerning the greater one, compliance with which was a condition to release of the retainage requirement
 
 
 [3]
 Within the category of intended beneficiaries, there is also a distinction made between creditor and donee beneficiaries. 2 Walter H.E. Jaeger, Williston on Contracts § 356, at 826-27 (3d ed.1959). This distinction, however, is not relevant to this discussion
 
 
 [4]
 In such cases, the impropriety of the government's release is based in equity and not on a contractual obligation to retain the funds. The release is equitably improper because the government, although it had no other duty to retain the money, released the money after receiving notice of the surety's interest and thus put the surety's subrogation rights at risk. See Fireman's Fund, 909 F.2d at 498; Ransom v. United States, 900 F.2d 242, 245 (Fed.Cir.1990). If the retainage is contractually required, however, and the government fails to retain payments, then the surety would have a claim for pro tanto discharge. See Restatement (Third) of Suretyship and Guaranty § 37 (1996)
 
 
 [5]
 As discussed below, I believe that the government unilaterally waived the requirement that the contractor submit the project arrow diagram and relied instead on a less detailed diagram
 
 
 [6]
 The majority characterizes the effect of the release of the retainage as an impairment of collateral. See Restatement (Third) of Suretyship and Guaranty § 42 (1996). I believe the proper approach to be one of a modification of the underlying obligation. See id. § 41. This difference, however, is irrelevant because the measure of damages under either would be the same--the extent of the prejudice to the surety. See id. § 37(3)